Cathy PARGO, Dale Bahmer, Kim Frazier, Sheryl Snodgrass, Christine Lockheart, Molly Bisson, Willetta Davis, Linda Thompson, Michele Neary, and unknown plaintiffs similarly situated, Appellants,

v.

Mildred ELLIOTT, Richard Vander Mey, Joni Keith, Harold McCormick, Jean Klingman, Johnny Brown, Jim Scheisow, Barbara Olk–Long, and Sally Chandler Halford, Appellees.

Civ. No. 4–92–CV–20781.

United States District Court,
S.D. Iowa,
Central Division.

July 14, 1995.

C.A. Frerichs, Thomas Frerichs, Waterloo, IA, and Emily Gosnell, Newton, NJ, for plaintiffs.

Kristin Ensign and Layne Lindebak, Des Moines, IA, for defendants.

## OPINION ON REMAND

BREMER, Chief United States Magistrate Judge.

| | | |
|---|---|---|
| I. | INTRODUCTION | 1251 |
| II. | EQUAL PROTECTION STANDARDS | 1252 |
| | A. Similarly Situated Analysis | 1254 |
| | 1. Overview of Iowa DOC Institutions | 1254 |
| | 2. Comparisons Within and Among Prisons | 1258 |
| | a. Limitations of Statistics | 1258 |
| | b. Factors To Be Considered | 1259 |
| | (1) Population size | 1259 |
| | (2) Security level | 1259 |
| | (3) Types of crimes | 1260 |
| | (4) Length of sentence | 1260 |
| | (5) Special characteristics | 1260 |
| | 3. "Similarly Situated" Determination | 1261 |
| | B. Level of Scrutiny | 1262 |
| | 1. Rational Basis | 1262 |
| | 2. Heightened Scrutiny | 1263 |
| | 3. Invidious Discrimination | 1264 |
| | C. Standards Applied | 1264 |
| III. | FINDINGS OF FACT AND CONCLUSIONS OF LAW | 1265 |
| | A. Claims Applicable to All ICIW Inmates | 1265 |
| | 1. Findings of Fact | 1265 |
| | a. Classification of Inmates for Purposes of Institutional Incarceration | 1265 |
| | b. Access to the Courts, Libraries, and Legal Materials | 1267 |
| | (1) Legal assistance practices by inmates | 1267 |
| | (2) Legal materials in the library | 1267 |
| | (3) Law library hours | 1268 |
| | (4) Photocopies of legal materials | 1269 |
| | (5) Availability of trained law library aides | 1269 |
| | c. Annual Classification Reviews | 1269 |
| | d. Classification Screening for Jobs | 1270 |
| | e. Classification Decisions to Segregate HIV/AIDS Inmates | 1271 |
| | f. Movie Censorship | 1271 |
| | g. Access to Counselors | 1272 |
| | h. Access to Canteens | 1272 |
| | i. Mathematical Errors in Canteen Orders | 1273 |
| | j. Long–Term Rehabilitative Treatment | 1273 |
| | k. Rate of Pay for Work Allowance | 1274 |
| | l. Educational Opportunities and Vocational Training | 1275 |
| | m. Rehabilitation—Gender Self–Esteem | 1276 |
| | n. Level A of the ICIW Inmate Level System | 1276 |
| | o. Visitation | 1277 |
| | 2. Conclusions of Law | 1278 |

B. Claims Applicable to Minimum Live–Out Security Inmates ........... 1280
 1. Findings of Fact ........................................ 1280
 a. Percentages of Women and Men Inmates Classified to Minimum Live–Out Housing ....................................... 1281
 b. Housing and Programming.................................. 1281
 c. Institutional Off–Grounds Work Opportunities................ 1281
 d. Yard Time and Yard Privileges and Opportunities ........... 1282
 e. Library Access......................................... 1282
 f. Furloughs for Minimum Live–Out Inmates .................. 1282
 g. Visitation for Minimum Live–Out Inmates .................. 1282
 h. Substance Abuse Programs for Women and Men Minimum Live–Out Inmates ......................................... 1283
 2. Conclusions of Law ...................................... 1283
C. Claims Applicable to Minimum Security Inmates ..................... 1284
 1. Findings of Fact ........................................ 1284
 a. Percentages of Women and Men Inmates Classified to Minimum Live–Out .............................................. 1285
 b. Off Institutional Grounds and Off Secured Perimeter Work Opportunities ......................................... 1285
 c. Yard Time and Yard Privileges and Opportunities .......... 1285
 d. Library Access......................................... 1286
 e. Access to Hobby Crafts ................................ 1286
 f. Telephone Privileges.................................... 1287
 g. Limitation on Canteen Privileges ........................ 1287
 2. Conclusions of Law ...................................... 1287
D. Claims Applicable to Medium Security Inmates...................... 1288
 1. Findings of Fact ........................................ 1288
 a. Policies and Practices for Inmates Obtaining Better Housing and Greater Privileges ....................................... 1288
 b. Yard Privileges ....................................... 1289
 2. Conclusions of Law ...................................... 1289
E. Claims Applicable to Maximum Security Inmates ..................... 1289
 1. Findings of Fact ........................................ 1289
 a. Policies and Practices for Inmates Obtaining Better Housing and Greater Privileges ....................................... 1290
 b. Yard Privileges ....................................... 1290
 2. Conclusions of Law ...................................... 1290
IV. CONCLUSION ..................................................... 1290
APPENDIX .......................................................... 1292
 A. Iowa DOC Statistical Summary (February 1994) ..................... 1292
 B. Time Served Before Parole (July 1992—June 1993) ................... 1298
 C. Summary of Institutional Security Levels and Inmate Security Levels (April 1993) ...................................................... 1298
 D. Types of Crimes (February 1994) ............................... 1299
 E. Number of Sentences Per Inmate (February 1994) .................. 1299
 F. Custody Score Breakdown (February 1994) ........................ 1299

## I. INTRODUCTION

■ Plaintiff class, inmates of the Iowa Correctional Institute for Women (ICIW), brings this 42 U.S.C. § 1983 action alleging that Defendants, officials of the Iowa Department of Corrections (DOC),[1] violated their rights under the Fourteenth Amendment Equal Protection Clause. Plaintiffs claim that certain policies, programs, practices,

---

**1.** The Plaintiffs presented no evidence as to the actions of the members of the Iowa Board of Corrections that form the basis for their claims. The doctrine of respondeat superior does not apply in a section 1983 action. *Monell v. Department of Social Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Hall v. Lombardi*, 996 F.2d 954, 961 (8th Cir.1993); *Crooks v. Nix*, 872 F.2d 800, 801 (8th Cir.1989). Section 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir.1990) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976)). The claims against these Defendants should be dismissed. The other two Defendants are Sally Chandler Halford, Director of the Department of Corrections, and Barbara Olk Long, Warden of ICIW.

services, and facilities at the State's only all-female correctional institution differ substantially from those at various components of Iowa's all-male correctional institutions, and that these differences constitute an equal protection violation.[2] Plaintiffs do not challenge the regulation requiring women inmates to be segregated from men inmates, or claim discriminatory funding.

Plaintiffs seek only declaratory and injunctive relief, not money damages. The case was tried before this court for six days in March and April of 1994 at ICIW in Mitchellville, Iowa. The record was reopened for two days in June and July of 1994, regarding ICIW's newly imposed security level incentive system. This court held that the Plaintiff class was not similarly situated to select groups of male inmates in the Iowa DOC system, relying on *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995) (rejecting equal protection challenge by the female inmates of the Nebraska Department of Corrections). *Pargo v. Elliott*, 894 F.Supp. 1239, 1242 (S.D.Iowa 1994) (Opinion and Judgment). This court also held that Plaintiffs failed to establish an equal protection violation, and found no discriminatory treatment or motive in the programs at ICIW. Judgment was entered for Defendants on September 23, 1994.

On Plaintiffs' appeal, the case was remanded for more detailed findings of fact and explanation of the conclusions of law reached. *Pargo v. Elliott*, 49 F.3d 1355 (8th Cir.1995). Both parties submitted supplemental briefs in light of the Eighth Circuit's opinion in this matter.

The court now enlarges its findings of fact and conclusions of law. The court has attempted to be concise in fulfilling the instructions on remand, mindful of the admonition that inter-prison program comparison "results in precisely the type of federal court interference with and 'micro-management' of prisons that *Turner* condemned." *Klinger*, 31 F.3d at 733 (following *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). The court has tried to strike a balance in finding sufficient facts on the issues at hand, without an overly elaborate detailing of prison life in Iowa. However, more than a cursory analysis is required because the reviewing court has requested "factual findings about the various programs and services, whether men and women inmates were similarly situated in terms of any particular program area, the differences in the programs, or the reasons for them." *See Pargo*, 49 F.3d at 1357. As requested, the court has expanded its conclusions of law to elaborate upon the correct standard to apply to the facts.

The legal analysis and factfinding here should serve for a clear understanding of the court's conclusion that, with regard to the claims raised, women and men inmates in Iowa are not similarly situated. The court also analyzed the record and determined that Defendants did not violate Plaintiffs' constitutional rights to equal protection.

## II. EQUAL PROTECTION STANDARDS

■ The court begins its analysis of the facts by looking at the classifications, by security level and programming, which Plaintiffs have selected for their claims of dissimilar treatment. The groups to be compared are not comprised of all women and men

---

**2.** The Complaint challenges programs and services by ICIW inmate classification: (A) *All ICIW Inmates*—classification, access to courts, annual classification review, classification screening for prison jobs, classification decisions to segregate HIV/AIDS inmates, movie censorship, access to counselors, access to canteens, treatment, education and training, self-image, inmate level system inequity, rate of pay, and visitation; (B) *Minimum Live–Out Custody Inmates*—minimum live-out classification disparities, housing, institutional off-grounds work, yard privileges, library access, furlough, visitation, substance abuse pro-

grams; (C) *Minimum Custody Inmates*—minimum live-out classification, work opportunities off-grounds, yard privileges, library access, access to hobby crafts, phone privileges, canteen limitations; (D) *Medium Custody Inmates*—off-grounds work, equity of level system, yard privileges, library access, access to hobby crafts, phone privileges, canteen limitations; and (E) *Maximum Custody Inmates*—equity of level system, yard privileges, library access, access to hobby crafts, phone privileges, canteen limitations, visitation.

inmates. Rather, Plaintiffs have elected to focus on programs and services offered to discrete groups of women inmates at ICIW, which comprise nearly all of the female prison population in Iowa. To accept the Plaintiffs' premise that "inmates are inmates" ignores the many factors relating to each penal institution in Iowa, as well as the constant changes affecting programs and services at each institution. The court thus looks beyond the gross classification of inmate status only.

■ The Fourteenth Amendment Equal Protection Clause of the United States Constitution requires the states to treat similarly situated persons in a substantially equivalent manner. *F.S. Royster Guano Co. v. Virgi-*

*nia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920); *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). However, "[d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Klinger,* 31 F.3d at 731. "Thus, the initial inquiry in analyzing an equal protection claim is to determine whether a person is similarly situated to those persons who allegedly receive favorable treatment." *United States v. Whiton,* 48 F.3d 356, 358 (8th Cir.1995). Courts have applied a variety of analyses to this threshold question, in some cases determining only that all inmates must be similar because they are inmates, and in other cases analyzing factors which govern the different institutions.[3]

3. Similar cases in which women inmates stated equal protection claims have employed various frameworks in confronting this threshold question. For example, the court in *Glover v. Johnson,* 478 F.Supp. 1075, 1082 (E.D.Mich.1979) (finding that prison programs offered to Michigan women inmates were substantially inferior to those available to male inmates), found that male and female prisoners were similarly situated, regardless of gender, because the state had the same general legislative purpose in administering its programs, assuming that the female prison population had no special needs. The *Glover* court developed its analysis in earnest on the subsequent issue of differences in treatment, concluding that the differences were "directly related to gender." *Id.* at 1078.

The court in *Canterino v. Wilson,* 546 F.Supp. 174, 206, 213 (W.D.Ky.1982) (finding sex-based disparities in conditions of confinement for Kentucky women inmates), as in *Glover,* conducted its equal protection analysis with the presumption that female prisoners at a single women's institution were similarly situated to all male prisoners in Kentucky. The *Canterino* court only observed a distinction regarding prisoners seeking "to exercise constitutional rights on an equal basis with people not in prison." *Id.* at 213. The *Canterino* court found that prisoners, whether male or female, were similarly situated to other prisoners. *Id.*

Another court, in *Pitts v. Thornburgh,* 866 F.2d 1450, 1454 (D.C.Cir.1989), found female and male prisoners similarly situated for purposes of a challenge to District of Columbia gender-specific policies that required women offenders to be incarcerated farther from the District than men prisoners. The key that led the *Pitts* court to its conclusion on this threshold inquiry turned on the fact that plaintiffs challenged the facially gender based policy. This "frame[d] the inquiry for [the] forthcoming discussion. A classification relying explicitly upon gender peculiarly suggests that the state is pursuing an improper purpose,

one that furthers or contains 'fixed notions concerning the roles and abilities of males and females.'" *Id.* (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982)).

In ruling on an equal protection claim brought by female inmates incarcerated at the Nebraska Center for Women (NCW), Nebraska's only all-female correctional institution, the trial court in *Klinger* explored the issue of whether women inmates at NCW were similarly situated to male inmates at the Nebraska State Penitentiary (NSP), one of Nebraska's several all-male institutions. *Klinger v. Nebraska Dept. of Correctional Serv.,* 824 F.Supp. 1374 (D.Neb.1993). "If the governmental purpose of treating males and females at NSP and NCW differently is intended to address the 'fact' that such persons are not 'similarly situated' because attributes not solely associated with gender may legitimately permit (if not require) differences in treatment, then different treatment of men and women at NSP and NCW is justified under the Equal Protection Clause, as a general principle, so long as the fact of 'dissimilarity' is true." *Id.* at 1385 (relying on *Parham v. Hughes,* 441 U.S. 347, 354, 99 S.Ct. 1742, 1747, 60 L.Ed.2d 269 (1979)).

The *Klinger* trial court provided five reasons NCW and NSP were similarly situated. First, inmates are inmates, without regard to gender or the different security mixes at NCW and NSP. Second, because custody levels at the two institutions are "roughly comparable," comparison of the inmates housed at the two locations is appropriate. Third, the general purpose of administering Nebraska prisons is the same for women's institutions as men's institutions. Fourth, while women's institutions present different security concerns from men's institutions, how inmates are situated with regard to privacy rights is not a prison security concern. Fifth, the underlying facial classification of gender segregation should

The Plaintiffs claim that certain groups of women inmates at ICIW are similarly situated to certain groups of male inmates at selected correctional institutions. To determine the question, the court must look beyond one's status as an inmate, and analyze the similarities and differences in the makeup of the various institutions. *Klinger*, 31 F.3d at 731–32; *see also Timm v. Gunter*, 917 F.2d 1093, 1103 (8th Cir.1990).

In *Pargo*, this court used population, average security levels, types of crimes, and average length of sentence as key factors to determine that ICIW and its women inmates are not similarly situated to Iowa correctional institutions housing male inmates of various security levels. *Pargo*, 894 F.Supp. at 1240–41; *see Klinger*, 31 F.3d at 731–32. The court found that ICIW's small population and the segregation of female inmates from male inmates influence programming, and there are clear differences in each prison's security needs. *Pargo*, 894 F.Supp. at 1242. An examination of key factors relating to the various correctional institutions in Iowa supports the court's conclusion.

## A. Similarly Situated Analysis

Plaintiffs have made comparisons between women inmates at the women's institution and male inmates at a variety of men's institutions. Iowa has eleven correctional institutions. One is designed to house female inmates on a long-term basis. Another houses men and women inmates on a short-term basis at the DOC prisoner intake center. The remainder are men's institutions housing prisoners for varying terms. In determining whether women and men inmates are simi-

larly situated, the court has examined all eleven institutions and makes the following findings of fact.[4]

## 1. Overview of the Iowa DOC Institutions

All eleven Iowa correctional institutions operate under the same general policies of the Iowa Code. DOC is the agency that is responsible for the control, treatment, and rehabilitation of all prison inmates in the state. Iowa Code § 904.102 (1993). The DOC states as its mission: "To protect the public through the community based and institutional supervision of offenders sentenced to the Department while providing a safe and humane environment and programming that encourages responsible behavior." Iowa DOC, *Annual Report* (1994). Thus, the DOC has dual goals of punishment and rehabilitation. Prison officials identified a number of penological interests that motivate the various policies adopted by the DOC: maintaining overall prison security for inmates, visitors, and staff within the prison; public safety outside the prison; inmate management that facilitates rehabilitation and security interests. (Defs.' Ex. C, DOC Policies IN–V–12; IN–V–20.1—20.5.) DOC policies apply to all institutions, without regard to gender. Each institution has funding to complete its goals. (Appendix C.)

**Iowa Medical and Classification Center (IMCC).** IMCC, located in Oakdale, was built in the early 1970s as the Iowa Security Medical Facility, and converted to a correctional facility in the mid–1980s. IMCC is a medium security institution authorized to house minimum, medium, and maximum se-

---

automatically trigger a heightened scrutiny analysis, and the question of gender differences should be articulated in the analysis of the fit between government objective and policy means. *Id.* at 1388–90. Thus, the *Klinger* trial court concluded that the women inmates at Nebraska's only all-female institution were similarly situated to men inmates at one of Nebraska's all-male institutions.

The Eighth Circuit rejected the district court's conclusion and found the females at NCW were not similarly situated to the male inmates at NSP. *Klinger*, 31 F.3d at 729. The appellate court focused on how NCW differed from NSP in terms of population, length of custody, custody

level of inmates housed, types of crimes, and other special characteristics that distinguish female inmates from male inmates. *Id.* at 731–32. The appellate court held that differences in programs, practices, and services between these two prisons were "virtually irrelevant because so many variables affect the mix of programming that an institution has." *Id.* at 733.

4. In order to assist the reviewing court, record cites are included in support of certain fact findings. The record includes the trial transcripts, deposition transcripts from 37 witnesses, and the exhibits. Additionally, the court has summarized some of the data as appendices.

curity inmates. (Pls.' Ex. 115.)[5] It is the "reception center" where all prisoners report after sentencing for assignments to other prisons. It also houses a few inmates for longer than the usual 90–day intake review, as well as inmate patients for mental health treatment. A double fence with armed guard towers surrounds the perimeter of the facility. (Trial Tr. at 976.) According to 1993 population figures,[6] IMCC housed 579 inmates;[7] this included 148 inmates classified as minimum security, 284 inmates classified as medium security; 10 inmates classified as maximum security, and 137 unclassified inmates.[8] (Appendix C.) At the time of trial, eight inmates at IMCC were serving life sentences. (Appendix D.) There typically are 10–15 women with extraordinary medical, psychiatric, discipline, or security concerns housed at IMCC. (Trial Tr. at 398–99; Loeffelholz Dep. at 6.) These women inmates are returned to ICIW when possible. (Brandt Dep. at 15–17.)

**Iowa State Penitentiary (ISP).** ISP, the oldest prison west of the Mississippi, was built in 1839 at Fort Madison. It is a traditional walled prison with armed guard towers. (Trial Tr. at 516.) The penitentiary is a maximum security facility. (Appendix C.) Inmates live in single cells. ISP has a design capacity of 570. (Appendix C.) According to 1993 population figures, ISP housed 596 inmates;[9] this included 61 inmates classified as minimum security, 64 inmates classified as medium security; 471 inmates classified as maximum security, and no minimum

live-out inmates. (Appendix C.) ISP also houses long-term protective custody inmates. (Trial Tr. at 390.) At the time of trial, about 230 inmates at ISP were serving life sentences. (Appendix D.)

**Iowa Men's Reformatory (IMR).** IMR, located in Anamosa, was built in 1873. Stone walls surround the prison, with armed guard towers at various points. (Trial Tr. at 549, 554.) IMR is a medium security institution authorized to house minimum and medium security inmates. IMR has a design capacity of 840, housing inmates in cells. (Appendix C.) According to 1993 population figures, IMR housed 1293 inmates;[10] this included 66 inmates classified as minimum security, 1154 inmates classified as medium security; 73 inmates classified as maximum security, and no minimum live-out inmates. (Appendix C.) At the time of trial, 91 inmates at IMR were serving life sentences. (Appendix D.)

**Luster Heights Work Camp (LHWC).** LHWC is a satellite facility of IMR, located in Harpers Ferry about 90 miles away from Anamosa. The facility is designed to house 82 inmates. (Hebron Dep. at 5; Wood Dep. at 4.) There is no perimeter security. (Trial Tr. at 555.) According to 1993 population figures, LHWC housed 72 inmates;[11] this included 71 inmates classified as minimum security, and one inmate classified as medium security. (Appendix C.) At the time of

5. This exhibit is Defendants' Answer to Interrogatory 25. The data for all DOC institutions is summarized in Appendix C.

6. Prison populations and programs constantly change at the eleven facilities. The findings provided in this opinion are based on data from trial exhibits using information from 1993, and testimony at trial based on information from 1994. There were many changes in prison procedures and programs during that time. The information set forth in this opinion may not reflect current operations of the institutions.

7. The population at IMCC increased to 725 male inmates and 40 female inmates at the time of trial. (Appendix A.)

8. At any given time, any of the eleven facilities discussed in this opinion could house inmates of any security level due to reclassification and

pending transfers. (Pls.' Ex. 115.) The practice of "overriding" an inmate's classification (treating a prisoner as if the inmate had a different custody score, so as to allow placement in a certain facility or program) is occasionally used at men's facilities. Overriding is no longer regularly used to manage the population at ICIW, as it had been in the past. Because classifications were overridden in 1993, Appendix C reflects no maximum security inmates at ICIW, although 16 inmates had maximum custody scores.

9. At the time of trial in 1994, the population at ISP was 570 inmates. (Appendix A.)

10. At the time of trial in 1994, the population at IMR increased to 1356. (Appendix A.)

11. At the time of trial in 1994, the population at LHWC increased to 77 inmates. (Appendix A.)

trial, no inmates at LHWC were serving life sentences. (Appendix D.)

**North Central Correctional Facility (NCCF).** NCCF is a minimum security facility in Rockwell City, with a razor wire perimeter fence patrolled by armed guards in vehicles. (Trial Tr. at 976.) A majority of its population comes directly from IMCC. (Burt Dep. at 5.) The average stay at NCCF is six months because most of the inmates there are awaiting parole. (Burt Dep. at 3–4.) The facility has a design capacity of 220. (Appendix C.) According to 1993 population figures, NCCF housed 236 inmates; [12] this included 235 inmates classified as minimum security, and one inmate classified as maximum security. (Appendix C.) At the time of trial, two inmates at NCCF were serving life sentences. (Trial Tr. at 394.)

**Mount Pleasant Correctional Facility (MPCF).** MPCF is a medium security unit with double razor wire fences and armed guard towers. (Trial Tr. at 976; Carruthers Dep. at 7.) MPCF has a design capacity of 528. (Appendix C.) According to 1993 population figures, MPCF housed 807 inmates; [13] this included 71 inmates classified as minimum security, and 736 inmates classified as medium security. (Appendix C; Roffe Dep. at 53.) At the time of trial, 11 inmates at MPCF were serving life sentences. (Appendix D.)

The focus at MPCF is on treatment. (Roffe Dep. at 3.) Approximately 55% of the inmates housed there are in a residential sex offender program or residential substance abuse program; the remaining 45% are general population inmates. MPCF is a licensed treatment center.

**Clarinda Correctional Facility (CCF).** CCF is a medium security facility with double razor wire fences and armed guard tow-

ers to secure the perimeter. (Trial Tr. at 385–86, 974.) CCF has a separate living unit that accommodates 60 inmates in The Other Way (TOW) program, a licensed residential substance abuse program. CCF has a design capacity of 155 inmates. (Appendix C.) According to 1993 population figures, CCF housed 273 inmates; [14] this included 71 inmates classified as minimum security, and 202 inmates classified as medium security. (Appendix C.) At the time of trial, nine inmates at CCF were serving life sentences. (Appendix D.)

**Iowa Correctional Release Center (CRC).** CRC is a minimum live-out facility in Newton. Some guards at the facility are armed; there are no guard towers. (Trial Tr. at 274.) CRC has a design capacity of 121. (Appendix C.) According to 1993 population figures, CRC housed 148 inmates; [15] this included 146 inmates classified as minimum security, and two inmates classified as medium security. (Appendix C.) At the time of trial, no inmates at CRC were serving life sentences. (Appendix D.)

**Farm 1 and Farm 3.** The "Farms" are two minimum security facilities near ISP that operate as working farms. The main facility is at Farm 1, located two miles north of ISP. Farm 3,[16] located ten miles south of ISP near Montrose, is more handicapped accessible.[17] (Helling Dep. at 10; Hedgepeth Dep. at 20.) Farm 1 inmates work on the facility's farm and do maintenance work at ISP. (Hedgepeth Dep. at 22.) Farm 3 inmates work at a tree farm in Shimek Forest, as well as working on the facility's regular farm. (Helling Dep. at 10; Hedgepeth Dep. at 20.)

The Farms have a combined design capacity of 150. (Appendix C.) According to 1993 population figures, the Farms housed 143

---

**12.** At the time of trial in 1994, the population at NCCF increased to 341 inmates. (Appendix A.)

**13.** At the time of trial in 1994, the population at MPCF increased to 815. (Appendix A.)

**14.** At the time of trial in 1994, the population at CCF decreased to 263. (Appendix A.)

**15.** At the time of trial in 1994, the population at CRC increased to 183. (Appendix A.)

**16.** Farm 2 is no longer in existence.

**17.** During the 1990 renovation of Farm 3, inmates housed there were temporarily relocated to Farm 1. Inmates challenged the conditions created by the move. *Patchette v. Nix,* Civ. No. 90–230–A (S.D.Iowa 1991), *aff'd,* 952 F.2d 158 (8th Cir.1991) (finding no Eighth Amendment violation, but ordering prison officials to comply with due process in modifying visitation policies).

inmates;[18] this included 142 inmates classified as minimum security, and one inmate classified as medium security. (Appendix C.) At the time of trial, no inmates at the prison farms were serving life sentences. (Appendix D.)

**John Bennett Correctional Center (JBCC).** JBCC is located adjacent to one wall of ISP. The perimeter is secured by a double razor wire fence and armed guard towers. (Trial Tr. at 515–16.) Unarmed guards are stationed within the units. JBCC is designated a medium security facility, with a design capacity of 100 inmates, and 137 minimum, medium, and maximum security inmates were housed there at the time of trial. (Trial Tr. at 514; Appendix C.) According to 1993 population figures, 12 inmates were classified as minimum security, 126 inmates were classified as medium security; and one inmate was classified as maximum security. (Appendix C.) At the time of trial, 11 inmates at JBCC were serving life sentences. (Appendix D.)

**Iowa Correctional Institution for Women (ICIW).** The court extensively toured the ICIW facility in connection with this litigation and held the trial on site in March and April of 1994.

The women's prison was first located in Rockwell City (at the NCCF facility that now houses male prisoners) and moved in 1985 to the present Mitchellville site, which was formerly a training school for juvenile girls. (Trial Tr. at 587.) Some of the staff at the training school remained when the facility was converted to the women's prison. (Trial Tr. at 587.)

The ICIW facility, located in a pastoral setting on the edge of a farming community about 20 miles east of Des Moines, consists of structures that were red brick school buildings, modified with security doors and windows for correctional use. Modern brick and block buildings have been added recently for dining, laundry, medical clinic, drug treatment, and housing. (Trial Tr. at 596.) Iowa Prison Industries has a commercial printing

facility on-site, which employs women inmates. The ICIW buildings surround an expansive, shaded commons area with large trees, benches, volleyball nets, and exercise stations. A large open yard used for team sport activities separates the outer grounds of the facility from neighboring corn fields.

ICIW, classified as medium security, is not a walled prison, and has no guard towers. (Pls.' Ex. 115.) A single fence with razor wire secures the perimeter, enclosing all but two of the ICIW buildings; the minimum live-out cottage and drug treatment building are just outside of the fence. (Trial Tr. at 598.) ICIW is the only prison in the Iowa system with no armed guards. (Trial Tr. at 977.) Before the perimeter fence was built in 1993, inmates could occupy the yard only with a guard present. (Trial Tr. at 594; Sebek Dep. at 40.) The construction of the perimeter fence increased the freedom of movement for most inmates at the institution.[19] (Trial Tr. at 594.)

Today, rather than presenting an ominous atmosphere, ICIW is more reminiscent of the campus of a rural high school. *Cf. Klinger,* 824 F.Supp. at 1381 (noting that "[a]lthough this case is not about ambience, in many respects [the Nebraska Center for Women] looks like a college campus"). During the day, the majority of the inmates are engaged in classroom, work, or recreational activities. ICIW currently provides a secure but relatively nonrestrictive environment conducive to rehabilitation.

ICIW is the only prison facility in Iowa designed for long-term housing of inmates of all security levels (minimum, medium, and maximum security), with a minimum live-out (MLO) facility. (Trial Tr. at 601.) ICIW also is the only Iowa facility that houses female inmates on a long-term basis. A new building houses medium and maximum security level prisoners. (Trial Tr. at 608.) Minimum security inmates either reside in the general population at ICIW, or are housed in the minimum live-out facility just outside the perimeter fence. (Trial Tr. at 611.)

---

**18.** At the time of trial in 1994, the population at the Farms decreased to 130 inmates. (Appendix A.)

**19.** Guard towers, which require staffing, have had the same effect at other institutions. (Trial Tr. at 554.)

About 300 women are incarcerated in the Iowa prison system, comprising about 6% of the total Iowa prison population. (Appendix A.) At the time of trial, approximately 250 women were housed at ICIW. (Appendix A.) ICIW has a design capacity of 230, with dormitory rooms equipped for two, four, or six inmates. (Trial Tr. at 854; Appendix C.) Inmate population at ICIW increased from about 60, in 1985, to the current population. Most ICIW inmates are designated at minimum and medium security levels. At the time of trial, only 16 inmates at ICIW were at the maximum security level, and about 20 inmates resided in the MLO facility. (Appendix C.) At the time of trial, 17 inmates at ICIW were serving life sentences. (Trial Tr. at 617; Appendix D.)

### 2. Comparisons Within and Among Institutions

■ In assessing whether women inmates at ICIW are similarly situated to inmates at men's institutions, no single factor dictates the outcome. The *Klinger* appellate court, as has this court, looked to the circumstances of incarceration: population, security levels, types of crimes, and length of sentence as among the key factors in determining whether women inmates and men inmates in varying distinctive institutions are similarly situated for this equal protection challenge. The size of the institution and the types of inmates housed there necessarily will affect the level of security and the number, type, and length of programs offered. 31 F.3d at 731–32.

An overall comparison of Iowa's prison population with the population at ICIW shows that ICIW is, in effect, a microcosm of the entire prison population. The ICIW population is not, however, similar to the inmate populations at any of the individual men's institutions. The age distribution, the educational levels, and the sentences imposed on

ICIW inmates, are roughly similar to the prison population as a whole. (Appendix A.) Unlike the women inmates, however, male inmates are concentrated in various institutions according to security levels. (Appendices A and C.) The result is greater variation among the various men's institutions, rather than within a single institution, with respect to age distribution, educational level, and sentence length. ICIW reflects greater variation within a single institution. Given these significant differences, prison administrators at each institution face very different challenges in providing adequate security and appropriate programming.

### a. Limitations of Statistics

The discussion that follows is subject to an important caveat: reliance on statistical comparisons of the various institutions may be misleading. Comparisons based on statistics must be precisely limited in order to be valid. Statistical comparisons might be accomplished through the use of the arithmetic mean, the median, the mode, or some other more sophisticated type of statistical analysis.[20] For example, there are eleven facilities in the Iowa prison system, with a total population of about 5,000 inmates. Thus, the arithmetic mean of inmates per institution is about 455. This mean does not accurately portray the wide disparities in populations, such as at IMR (1400 inmates), LHWC (75 inmates) and ICIW (230 inmates). Nor does the arithmetic mean suggest that ISP, with about 550 inmates and the largest representation of inmates serving maximum security and life sentences, represents the "average" institution in Iowa. Moreover, the arithmetic mean does not account for the composition of the security levels at the institutions. This is particularly true of ICIW, which is the only institution specifically designed to house inmates from *all* security levels. (Trial Tr. at 601.)

In analyzing the relevant factors, the court performed only the most rudimentary statistical comparisons of the various institutions, using the raw data admitted at trial. Although more elaborate statistical analyses would have been admissible, neither of the parties provided that type of evidence.

---

**20.** The arithmetic mean is determined by "adding all of the numbers together and dividing by how many numbers there are." Federal Judicial Center, *Reference Manual on Scientific Evidence* 360 (1994). The median indicates a number that designates the midpoint; half the numbers are larger, and half the numbers are smaller. *Id.* The mode, or commonality, is the most common number of the set. *Id.*

According to 1993 statistics, the ICIW population comprised only 6% of the total prison population. (Appendix A.) Within the ICIW population, only about 7% were serving life sentences. (Appendix D.) At the time of trial, only about 8% of the ICIW population was housed in the MLO facility. (Appendix A.) When the sample size is so small, any conclusions as to women inmates serving life sentences or women inmates in the MLO facility may be tenuous. To make any inferences that are "statistically significant," a larger sample would be required. *See* J. Levin & J. Fox, *Elementary Statistics in Social Research* 14–17 (1994) [hereinafter referred to as Levin & Fox]. In fact, given the small percentage of women inmates, most statistical comparisons will be of limited value.[21] In analyzing statistics, the court also is cautious not to read into demographic data pejorative stereotypes or rationalizations "that potentially might effect the violation of a constitutional right." *Bills v. Dahm,* 32 F.3d 333, 336–37 (8th Cir.1994) (equal protection challenge between a men's institution and a women's institution regarding visitation by a male inmate's infant).

█ Smaller institutions are not immune from statistical comparisons, but sound conclusions are necessarily limited. Thus, in discussing "averages" within the prison population in Iowa, the court is generally aware of commonalities not skewed by the arithmetic means. The court finds frequency distribution rather than the arithmetic mean more appropriate to its analysis. *See* Levin & Fox, *supra,* at 12–14. For example, the average education level at ICIW is 11.6 years, as is true of LHWC, MPCF, NCCF and Farm 1. (Appendix A.) Yet, the actual number (and the population percentage) of inmates who have completed a GED varies from 91 (38%) at ICIW to 39 (51%) at LHWC.

### b. Factors To Be Considered

In analyzing Plaintiffs' claims, the court has examined the factors set out in *Klinger,* 31 F.3d at 731–32, in determining whether the women and men inmates are similarly situated. These factors include population size, security levels, types of crimes, average length of sentences, and special characteristics.

### (1) Population size

The population size of an institution (the number of inmates actually housed in the facility, as opposed to design capacity) is an important factor that is used when determining the policies and programs at a particular institution. Security and management concerns at a large, overcrowded institution are very different from the concerns at a small institution that is not overcrowded.

In 1994, ICIW's inmate population was 238. (Appendix A.) ICIW falls in the mid-range of the Iowa prison population size, with populations in the eleven facilities varying from about 1400 to about 50. General population statistics do not take into account the multilevel security issues that arise at ICIW.

### (2) Security level

█ A second factor that influences daily operation is the security level at each institution. The court does not place great weight on the "average" (arithmetic mean) security level at ICIW because the ICIW population includes a wider range of security levels than any single men's institution. In the men's institutions, similar security level inmates, for the most part, reside together in institutions appropriately designed for their security level. (Appendix C.) The arithmetic mean security level for men's institutions is therefore more likely to reflect the frequency distribution at that institution than would be true for ICIW. For example, ISP is designated a maximum security institution. As of April 1993, almost 90% (471) of the inmates at ISP were designated maximum security. (Appendix C.) MPCF is designated a medium security facility. About 90% (736) of the inmates were classified as medium security. CRC is designated a minimum security facility; nearly all inmates were designated medium security. Although ICIW was designated a medium security facility, only about half

---

**21.** Some statistical comparisons that might be valuable cannot be made because comparable statistics for women and men inmates were not introduced into the record.

of the inmates were designated medium security. (Appendix C.)

### (3) Types of crimes

■ A third factor in determining similarity is the types of crimes for which inmates were convicted. Types of crimes for which inmates are sentenced are separated by the DOC into four categories: crimes against persons, nonperson crimes, chemical crimes, and life sentences. (Appendix A.) The type-of-crime factor will weigh heavily on administrative decisions concerning security and the type of rehabilitative programs and policies that should be implemented.

At the time of trial, just under half of the offenses committed by inmates housed at ICIW were nonperson crimes, one-fourth were crimes against persons, and one-fifth were chemical crimes; the remaining 5% were life sentences. (Appendix D.) Some of the men's institutions predominantly housed inmates convicted of nonperson offenses (the Farms, LHWC, CCF, NCCF, and CRC) while others were about evenly divided between person and nonperson crimes (JBCC, IMR, IMCC, and MPCF) or predominantly crimes against persons (ISP). (Appendix D.) The population at ICIW is more diverse in terms of types of crimes committed than is reflected in individual men's institutions. The wider variations in security levels raise different security concerns for the prison officials, and types of offense are only somewhat probative in comparing institutions.

### (4) Length of sentence

■ A fourth factor to be examined is the length of sentence served by the inmates at each individual institution. The "average" sentence (that is, the arithmetic mean) imposed upon an inmate at ICIW is about 11 years. (Defs.' Ex. B.) As with the arithmetic mean of security levels, the arithmetic mean of sentences is misleading with respect to ICIW, which is only a small part of the total prison population and which houses a broad range of inmates. A small or diverse

population may skew calculations of the arithmetic mean. Prison officials testified that women generally did not spend as much time in prison as men, even for committing similar crimes.[22] (Trial Tr. at 792; Halford Dep. at 10.) Warden Long attributed this phenomenon (experienced nationwide) to three factors: (1) women generally commit fewer crimes; (2) women tend to commit less serious crimes; and (3) women are perceived as a lower risk to society because they often have more ties to family and community, and thus are paroled sooner. (Trial Tr. at 832.)

As shown in data from February 1994, Iowa women inmates generally had fewer sentences and lower security classifications than men inmates. (Appendices E and F.) In 1992–93, 203 women and 2,098 men inmates were eligible for parole. When comparing sentences served by inmates paroled for serious or aggravated misdemeanors, women served an average of 8.5 months, and men served an average of 7.75 months. Of inmates paroled for undesignated felonies, women served an average of 148 months, and men served an average of 218 months. Of inmates paroled for class D felonies, women served an average of 14 months, and men served an average of 17 months. Of inmates paroled for class C felonies, women served an average of 26 months, and men served an average of 40 months. Of inmates paroled as habitual offenders, women served an average of 96 months, and men served an average of 73 months. From June 1992—July 1993, no women inmates were eligible for parole for class B felonies, but men inmates served an average of 92 months. (Appendix B.) Thus, on the whole, women served less time than men, especially for the more serious felonies.

### (5) Special Characteristics

Finally, there may be special characteristics of one group of inmates not comparable to another that should be considered when determining the similarity of the institu-

---

**22.** This is consistent with empirical research that has been conducted elsewhere. *See* Steffensmeier et al., *Gender and Imprisonment Decisions,* 31 Criminology 411 (1993); Spohn et al., *Women Defendants in Court: The Interaction Between Sex* and *Race in Sentencing,* 66 Soc.Sci.Q. 178 (1985); Gruhl et al., *Women as Policymakers: The Case of Trial Judges,* 25 Am.J.Pol.Sci. 398 (1981).

tions.[23] The *Klinger* appellate court found: female inmates as a class have special characteristics distinguishing them from male inmates, ranging from the fact that they are more likely to be single parents with primary responsibility for child rearing to the fact that they are more likely to be sexual or physical abuse victims. Male inmates, in contrast, are more likely to be violent and predatory than female inmates.

31 F.3d at 731–32. In assessing whether institutions are similarly situated with respect to gender, the court takes notice of claims of special characteristics when determining whether any disparity in policies is justified. The court finds that ICIW does offer special programs directed toward special needs of women inmates.

ICIW does not offer a sexual abuse victim treatment program because administrators believe there is no definitive research that significantly correlates victimization and criminal behavior. (Halford Dep. at 37.) ICIW officials recognize that the majority of the inmates report that they were victims of domestic violence, physical violence or sexual abuse. (Brainerd Dep. at 11.) Programs about domestic violence, prostitution, and incest survivors were developed a number of years ago. (Trial Tr. at 590–91.) A family preservation program also is offered at ICIW because many of the inmates were custodial parents before entering the institution. (Trial Tr. at 810.) Inmates have received counseling for postpartum depression. (Brainerd Dep. at 34.) ICIW provides classes in anger management and self-esteem. (Brainerd Dep. at 38–39.) Inmates with eating disor-

ders have been sent to IMCC. (Brainerd Dep. at 35.) Thus, Iowa prison officials consider special inmate needs in setting up programs at ICIW.

### 3. "Similarly Situated" Determination

■ Based on the factors of population size, security level, types of crimes, lengths of sentences, and special characteristics of inmates, the court concludes that ICIW inmates are not similarly situated to the various categories of male inmates at selected institutions. These factors highlight several important differences between women and men inmates. First, the women's institution uniquely combines all security levels of inmates. Women inmates constitute a very small portion (6%) of the total prison population,[24] so they all can be housed at a single institution. Second, women generally spend less time in prison than men because women generally are sentenced for fewer crimes, and for less serious crimes. Women often are paroled earlier than men because they are considered to be lower risk parolees.[25] Third, characteristics common to inmates at the women's institution are different from characteristics of inmates at men's institutions. The differences among the various men's institutions and ICIW are so significant that comparisons between the two would ignore "separate sets of decisions based on entirely different circumstances." *See Klinger*, 31 F.3d at 732. The court holds that Iowa women inmates and men inmates, grouped in large or divided classifications, are not similarly situated.

■ Generally, equal protection analysis requires that the Fourteenth Amend-

---

**23.** There are other factors that courts have used to determine whether inmates are similarly situated. For example, the *Timm* court looked at the average age of the inmates. *Timm*, 917 F.2d at 1099. In the Iowa system, this average age range is from the low to mid-thirties at all of the institutions, although there are geriatric inmates at most institutions. (Appendix A.) Another factor examined by the *Timm* court was the number of events involving violence, escapes, and contraband. 917 F.2d at 1099. Although the parties did not provide any evidence regarding incidents of violence at the various institutions, there was testimony that the atmosphere at ICIW was more relaxed than at some of the medium or maximum security facilities. (Trial Tr. at 544–46.) In fact, the atmosphere at ICIW is more like that

at the (minimum security) prison farms. (Trial Tr. at 544–46.) The court finds this testimony to be credible.

**24.** This is consistent with national data regarding female prisoners. *See* Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics*, Table 6.69, at 622; Table 6.82, at 634 (1992).

**25.** The Iowa Parole Board developed a risk assessment model for consideration of parole, which takes into account the inmate's criminal record and age, the seriousness of the crime committed, and the number of offenses for which the inmate is incarcerated. Gender is not a factor. (Pls'.Ex. 117.)

ment be applied only to groups that are similarly situated. Ending the inquiry at this point, however, is unwarranted if there are other indications of gender-disparate treatment or invidious discrimination. At least one Eighth Circuit case has indicated that, even when the comparison groups are not found to be similarly situated, a district court must proceed to consider whether differential treatment has a rational relationship to a legitimate state interest. *Bills v. Dahm*, 32 F.3d 333, 336 (8th Cir.1994). In another case, the Eighth Circuit reviewed equal protection claims to ensure that there had been no invidious discrimination. *Ricketts v. City of Columbia*, 36 F.3d 775, 781 (8th Cir.1994). Despite the conclusion that women and men are not similarly situated, the court will proceed with further analysis based on these precedents, as it did in *Pargo*, 894 F.Supp. at 1243.

## B. Level of Scrutiny
### 1. Rational Basis

In a case involving an inmate gender discrimination claim, the Eighth Circuit held that even if classes are found not to be similarly situated, a court still must apply a rational basis analysis.[26] *Bills*, 32 F.3d at 336.

The *Bills* court instructed as follows:

Although Mr. Bills may not be similarly situated to the inmates of the NCW, he is entitled to a determination of whether the regulation complained of is arbitrary. Where men and women are found not to be similarly situated, the court must still determine whether it would have been reasonable for a prison official to believe that the denial of overnight child visitation to Mr. Bills, in light of the program at the NCW, was rationally related to a permissible state objective. In *Parham*, the Court upheld a Georgia law that denied a biological father the right to recover in a wrongful death action for the death of an illegitimate child. The decision of the Court affirmed the Georgia Supreme Court's determination that, although the mother and father were not similarly situated, the statute had to at least have a rational relationship to a legitimate state interest.

32 F.3d at 336 (relying on *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979)) (citations omitted).

There have been at least three published opinions by the Eighth Circuit since *Bills* was decided in which the court concluded that the parties were not similarly situated, and then did not continue on to determine

---

**26.** This portion of *Bills* appears, however, to be based on an expansive reading of *Parham v. Hughes*, 441 U.S. 347, 348, 99 S.Ct. 1742, 1744, 60 L.Ed.2d 269 (1979).

The *Parham* citation in *Bills* is to the judgment for the court, written by Justice Stewart. This was a plurality opinion by four justices. *Id.* Justice Powell's concurrence, which provided the fifth vote for affirmance, implicitly found that the parties were similarly situated and then applied heightened scrutiny, concluding that the Georgia statute at issue met that standard. *Id.* at 359–60, 99 S.Ct. at 1749–50. There is no reference in Justice Powell's concurrence to support going on to review whether different treatment of dissimilarly situated parties is rationally related to a legitimate state interest. Likewise, the four dissenting justices also applied the heightened or intermediate scrutiny standard, but concluded that the state did *not* satisfy it. *Id.* at 361–62, 99 S.Ct. at 1750–51. There were five justices who did not apply Justice Stewart's supposed procedure of submitting disparate treatment of dissimilarly situated individuals to a rational relationship test.

*Parham* involved an equal protection challenge to a Georgia statute which allowed birth mothers

to sue for the wrongful deaths of their "illegitimate" children, but only allowed birth fathers who had followed a judicial procedure for acknowledging their paternity to file such suits. *Id.* at 348–49, 99 S.Ct. at 1744–45. The plurality opinion in *Parham* does not provide a bright line to follow, but a close reading suggests this rationale: (1) the classes consisting of (a) mothers of illegitimate children and (b) fathers of illegitimate children were not similarly situated as to wrongful death suits, as it is more difficult to be certain of a child's father than its mother; (2) the classes created by the statute itself were the class of fathers who have legitimated their children and the class of those who have not; (3) these classes are not suspect (not "invidiously discriminatory"), and thus the rational basis standard (presumption a statute is valid) applies; and (4) there is a rational basis for treating fathers who have legitimated their children differently from those who have not. *Parham*, 441 U.S. at 355–57, 99 S.Ct. at 1746–47; *see also* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law, Substance and Procedure* § 18.15, at 246–48 (2d ed. 1992).

whether a rational basis for differential treatment existed. *Association of Residential Resources v. Gomez*, 51 F.3d 137, 140–41 (8th Cir.1995) ("Because the private and public [mental health] facilities are not similarly situated, [a state rule providing different reimbursement formulas] does not violate the Equal Protection Clause"; providing *alternative* holding that even if the facilities were similarly situated, "the dissimilar treatment is rationally related to a legitimate state purpose"); *Ricketts*, 36 F.3d at 781 n. 2 (gender discrimination; "dissimilar treatment of those not similarly situated does not result in an equal protection violation"); *Klinger*, 31 F.3d at 731 (prison gender discrimination case; "[a]bsent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim"). In none of these cases was *Bills* followed, or overruled.

### 2. Heightened Scrutiny

■ When a challenge is made to a facially discriminatory policy, or one which has been shown to have a disparate impact on women, the court reviews under a heightened scrutiny analysis. *See Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Traditionally, a facial classification triggers the stepped-up scrutiny in order to remedy the "fixed notions concerning the roles and abilities of males and females." *Pitts*, 866 F.2d at 1454 (quoting *Mississippi Univ. for Women*, 458 U.S. at 724, 102 S.Ct. at 3336). The court in *Pitts*, applying the *Craig* heightened scrutiny test, reviewed "general budgetary and policy choices" made in a facially gender based decision not to build a women's prison facility in the local District of Columbia area. *Id.* at 1454–55.[27]

Defendants argue that the heightened scrutiny test does not apply because there are no differences in treatment, and the classes of inmates are not similarly situated. The Defendants claim that the burden of proof never shifts to the government to establish that gender classification has an important purpose and that the relationship between that purpose and classification is substantial. Therefore, Defendants have elected not to claim "important governmental objectives" in any different treatment of male and female inmates. (Defs.' Answer to Interrog. 132.)

■ Prison policies may be subject to a heightened scrutiny review in an equal protection analysis of the decision making process. "[M]ale and female inmates are similarly situated for purposes of the *process* by which the Department makes programming decisions. That is, instead of alleging differences in programs between prisons, a proper equal protection claim may allege differences in the process by which program decisions were made at the prisons." *See Klinger*, 31 F.3d at 733 n. 4 (emphasis in original).

■ However, Plaintiffs have not cited to any facially gender based state law or "general budgetary and policy choices" in support of their claims. Nor have the Plaintiffs challenged the decision to segregate women and men inmates, or any budget allocation for ICIW.[28] Additionally, Plaintiffs failed to present evidence of policies that were motivated by discriminatory intent. *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979). Because of this, the court does not engage in the *Craig* heightened scrutiny analysis.

■ In spite of the prison dissimilarities, administrators' decisions are subject to scrutiny. After applying a rational basis analysis, the court has examined the entire record to determine whether any vestiges of invidious discrimination remain at ICIW, even

---

**27.** The *Pitts* court distinguished the lower burden of *Turner v. Safley*, recognizing that the reasonableness standard applies to practices that govern day-to-day operations, such as prison security, control of inmate behavior, environment, and regime. *Pitts*, 866 F.2d at 1453–54.

**28.** As in *Pitts*, 866 F.2d at 1458, "appellants do not quarrel with the federal prison system's es-

tablishment of facilities restricted to a single sex. Nor do appellants attack the gender-based segregation within the few federal facilities that incarcerate both men and women.... We therefore assume for purposes of our analysis that these general, widespread practices in American prison systems do not run afoul of constitutional commands."

though women and men inmates are not similarly situated. *Pargo,* 894 F.Supp. at 1243.

### 3. Invidious Discrimination

The Court in *J.E.B. v. Alabama ex rel. T.B.,* —— U.S. ——, ——, 114 S.Ct. 1419, 1425, 128 L.Ed.2d 89 (1994), recently observed that "our Nation has had a long and unfortunate history of sex discrimination." Society's discriminatory and stereotypical assumptions pertain, as well, to women in prisons. *See* Rosemary Herbert, Note, *Women Prisons: An Equal Protection Evaluation,* 94 Yale L.J. 1182, 1192 (1985) (arguing that gender-segregated prisons "developed from inaccurate, paternalistic assumptions of the type that have been found to stigmatize in other contexts"). The court is aware of the historical trends in corrections when women have been treated in stereotypical and paternalistic ways. *See* Meda Chesney–Lind, "Rethinking Women's Imprisonment: A Critical Examination of Trends in Female Incarceration," *in The Criminal Justice System and Women* 113 (Barbara R. Price & Natalie J. Sokoloff eds., 2d ed. 1995) [hereinafter referred to as Chesney–Lind].[29] The court also is aware that, historically, women's prison programs were "fewer and less varied" than the men's prison programs. Merry Morash et al., *A Comparison of Programming for Women and Men in U.S. Prisons in the 1980s,* 40 Crime & Delinq. 197, 197 (1994) [hereinafter referred to as Morash]. Women's prison programs have been criticized for inadequate variety; qualitative differences based on stereotypes of women and men; and failure to address unique needs of women inmates.[30] *Id.* These circumstances do not, however, exist at ICIW.

In reviewing the extensive record in this case, the court finds Iowa DOC officials have acknowledged their awareness of historical trends. The ICIW warden testified that one of her goals was to eliminate historical paternalism by bringing ICIW into compliance with DOC policy, which means administering programs that establish in the women inmates the attitudes of being independent, self-sufficient, and having pride and self-worth. (Trial Tr. at 818–20.) For women inmates, the Iowa DOC provides a variety of programs; educational opportunities; access to legal materials; and work opportunities that include jobs not limited to those based on stereotypical views of women.

 When inmates who are not similarly situated raise claims of gender discrimination, this court will still take cognizance of the valid constitutional claims of prison inmates. The court will not apply a heightened scrutiny test when no facially discriminatory policy has been challenged, but the court has scrutinized the evidence for signs of invidious gender discrimination, "the ultimate object of heightened scrutiny."[31] *See Pitts,* 866 F.2d at 1459. The burden of proof remains on Plaintiffs to identify policies or processes which discriminate against women. "When a widespread custom of a municipality impacts disproportionately on one gender, an equal protection violation arises 'only if that impact can be traced to a discriminatory purpose.'" *Ricketts,* 36 F.3d at 781 (citing *Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292–93).

### C. Standards Applied

In the Findings of Fact and Conclusions of Law section that follows, the court has detailed differences and similarities in programs and services offered to ICIW women and offered at certain men's institutions. The court also has scrutinized the programs and services offered to ICIW inmates of all

---

**29.** In the late 1800s, white women were imprisoned not because they posed a risk to public safety, but because they were in need of moral revision and protection; black women were incarcerated in men's prisons because they were perceived as public safety risks. Chesney–Lind, *supra,* at 113.

**30.** National trends in the 1980s continued to indicate stereotypical work assignments, differences in the use of medication and mental illness services for women, and a lower use of legal materials by women inmates. Morash, *supra,* at 218–19.

**31.** "Even assuming the inmates are similarly situated, however, that is merely the beginning of the analysis. A fundamental principle of equal protection is that the Constitution only prohibits intentional or purposeful discrimination by the state." *Klinger,* 31 F.3d at 733 (relying on *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293–94).

security levels using a rational basis analysis, taking cognizance of the legitimate penological interests established in the record. *See Turner*, 482 U.S. at 84, 107 S.Ct. at 2259; *Bills*, 32 F.3d at 336. Although the court bypassed a *Craig* heightened scrutiny analysis, it has searched for invidious discrimination in programming decisions and implementation. *See Klinger*, 31 F.3d at 733; *Ricketts*, 36 F.3d at 781.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs order their allegations in the following groupings: claims applicable to all ICIW inmates; claims applicable to minimum live-out inmates; claims applicable to minimum security inmates; claims applicable to medium security inmates; and claims applicable to maximum security inmates. The court will address the issues in that order.

### A. Claims Applicable to All ICIW Inmates

#### 1. Findings of Fact

Plaintiffs raise 15 issues pertaining to all ICIW inmates. Again, the court finds women inmates are not similarly situated to men inmates. Based on the following findings of fact, the court concludes that the challenged policies are gender neutral in design and application. In addition, the court concludes that there is a rational basis for the implementation of these gender neutral policies. The court has found no evidence of any invidious discrimination.

#### a. Classification of Inmates for Purposes of Institutional Incarceration

A person sentenced to prison in Iowa, whether female or male, is first sent to IMCC, where the DOC staff assigns a custody score, based upon written objective standards imposed without regard to the inmate's gender. (Trial Tr. at 382, 385.) The goal is to "place inmates in the least restrictive security level consistent with security and treatment needs." (Trial Tr. at 376.) Security classifications are based on the seriousness of the offense, the inmate's prior record, and personal and behavioral characteristics of the inmate. Gender is not a consideration in the classification decision. (Felker Dep. at 20.)

The custody scores can range from 1–18 and determine the security level of the inmate. A custody score of 1–5 is classified as minimum security; a score of 6–10 as medium security; and a score of 11 and higher is classified as maximum security. (Trial Tr. at 380–81; Defs.' Ex. C, IN–V–20.2.) The custody score determines in which of nine locations male inmates will be housed; nearly all women inmates are sent to ICIW. (Trial Tr. at 386; DOC Policy IN–V–20.2.)

After initial screening at IMCC, minimum security men are housed at IMR, Farm 1 or Farm 3, NCCF, or CRC; minimum security women are housed at ICIW. (Trial Tr. at 383.) Medium security men are housed at MPCF, CCF, IMR, or JBCC; medium security women are housed at ICIW. (Trial Tr. at 385–86.) Maximum security men are housed at IMR or ISP; maximum security women are housed at ICIW. (Trial Tr. at 386.) [32]

DOC policy allows each institution to develop a "level system" to grant extra privileges to inmates as incentives for good behavior. (Defs.' Ex. C, IN–V–20.1.) ICIW and some men's institutions utilize level systems. The custody score, which determines the security level of the inmate (maximum, medium, or minimum security) also is used in determining an inmate's privilege level within the institution. At ICIW, the privilege level system sets out the privileges available to inmates at the maximum, medium, or minimum security levels. Within the various security classifications, inmates can gain or lose privileges based on their behavior in the institution. Due to the variations in physical plants, population, and programming among the facilities, it is difficult to compare privilege level systems between ICIW and the

---

**32.** As noted in the discussion of the IMCC facility at Section II(A)(1) above, some exceptions to the general rule are made, based on individual circumstances. (Trial Tr. at 382–83.) For example, IMCC also houses 10–15 female inmates with extraordinary medical, psychiatric, security, or disciplinary concerns. These female inmates are returned to ICIW when possible. (Trial Tr. at 398–99; Brandt Dep. at 15–17.)

men's facilities as a whole, or even among the men's institutions. ICIW is in a unique position, as the only prison in Iowa designed to house all security classifications of inmates, from maximum security to minimum security inmates. Thus, ICIW must accommodate a wider variation of security needs than any of the men's institutions. (Trial Tr. at 601.) In operating the privilege level system at ICIW, prison officials separate the population within a single facility to reflect the privilege levels of the various security classifications for women in the institution. (Pls'.Ex. 131.) As a result, the privilege level system at ICIW, an institution with a single fence which houses a range from maximum to minimum live-out inmates, is different from the privilege level systems in walled institutions, such as IMR or ISP, which house inmates with primarily the same security classification, or from a privilege level system at minimum live-out facilities, such as LHWC.

The less restrictive privilege levels at ICIW are comparable to those used at LHWC, the prison farms, and CRC. However, the most restrictive security level at ICIW is not comparable to institutions designated as maximum security facilities because ICIW has no walls, cells, guard towers, or armed guards. The ICIW inmates classified as medium and maximum security benefit from being housed with minimum security inmates, in that while in the general population, they mix with the minimum security inmates. Rather than governing all inmates by the requirements for the maximum security prisoners, ICIW imposes the fewest restrictions and manages behavior with fewer restrictions, particularly when compared to men's medium and maximum security institutions.

The DOC has developed policies specific to all inmates serving life sentences at any prison facility.[33] (Defs' Ex. C, IN–V–20.3.) Each inmate serving a life sentence is required to serve ten years at the maximum security level. (Trial Tr. at 392–93.) If after an inmate serving a life sentence has served ten years, and has had no disciplinary reports for the previous two years, reclassification to a medium security level is possible. (Trial Tr. at 393.) Then, after eight years at the medium security level, the inmate serving a life sentence may become eligible for the minimum security level. (Trial Tr. at 393.) At ICIW, women inmates serving life sentences mix with minimum security general population inmates sooner than do male inmates and generally receive more privileges than male inmates. (Trial Tr. at 621.)

▮ Plaintiffs accurately point out that male inmates are routinely transferred among institutions because of changing security classifications and treatment needs, while most women inmates remain at ICIW. The court, however, disagrees with Plaintiffs' claim that no women inmates are classified out of IMCC to an institution whose primary role is rehabilitative treatment, or whose primary mission is to prepare inmates for successful reentry into free society. (Plaintiff Class' Proposed Findings of Facts, Conclusions of Law and Order at 14 [hereinafter Pls.' Proposed Findings of Facts].) The court finds ICIW has the same primary dual purpose of security through inmate management and rehabilitation through treatment and counseling as is true for the men's facilities. (Defs.' Ex. C, DOC Policies IN–V–12; IN–V–20.1–20.5.) Due to the size of the inmate population, the Parole Board recognizes that in Iowa, male inmates who progress through the various security levels will be transferred among institutions, whereas female inmates who progress through the various security levels will remain in the same institution under different security classifications. (Trial Tr. at 872–73.) The ICIW system of intra-institution movement by women from one security level to another, or from a living unit to the on-site treatment unit has been recognized by the Parole Board as comparable to men's transfers from one institution to another based on changes in security classification or treatment needs.

33. There may be some exceptions to this policy for inmates serving life sentences who are subject to standards imposed earlier, such as under the *Hazen* decree. In 1981, male prisoners at ISP challenged policies at the women's prison as being less restrictive than those at men's prisons. The court approved a consent decree, which still governs certain conditions at ISP. *Hazen v. Reagan,* Civ. No. 75–201–1 (S.D.Iowa July 23, 1982) (Ruling and Order Approving Settlement).

### b. Access to the Courts, Libraries, and Legal Materials

Plaintiffs' claims on the issue of access to the courts can be broken into five distinct categories: (1) legal assistance practices by inmates; (2) legal materials in the library; (3) law library hours; (4) photocopies of legal materials; and (5) availability of trained law library aides.

#### (1) Legal assistance practices by inmates

Plaintiffs claim that they do not receive comparable access to inmate legal assistants because the DOC policy is applied in a more restrictive fashion at ICIW.

Inmate legal assistants ("jailhouse lawyers") are permitted at ICIW according to DOC policies. (Trial Tr. at 705–06.) Because of some confusion about the difference between jailhouse lawyers and library aides and problems relating to their use, ICIW, like most men's institutions, requires jailhouse lawyers to register before giving advice, and to agree not to charge for the legal advice given. (Pls.' Exs. 3, 4.) Under ICIW policy, an inmate may register with the program director to be put on a list of people available to work with other inmates by assignment or agreement. (Trial Tr. at 705.) The jailhouse lawyer can sign an agreement with another inmate to provide legal assistance at no charge. (Trial Tr. at 705.) The inmate and the jailhouse lawyer can then pass legal materials to each other for discussion. (Trial Tr. at 706.) Jailhouse lawyers cannot be involved in grievance or disciplinary matters. (Trial Tr. at 706.)

Legal assistance practices by inmates at men's facilities vary. At IMCC, jailhouse lawyers are permitted to register to assist other inmates, and inmates have access (primarily by telephone) with an attorney who handles civil matters. (Brandt Dep. at 7, 9.) ISP jailhouse lawyers cannot operate between ISP and JBCC. (Helling Dep. at 24–25.) Jailhouse lawyer privileges can be taken away as a disciplinary measure. (Helling Dep. at 25.) Jailhouse lawyers are no longer required to register at ISP. (Helling Dep. at 26.) At ISP, legal materials can be taken to the library, but not to the yard or gym. (Helling Dep. at 27.) IMR does not have a trained legal assistant. (Sissel Dep. at 10–13.) No evidence was developed at trial on legal assistance practices at NCCF, MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

As an example of the impact of ICIW's policy on legal assistance by inmates, Plaintiffs introduced evidence that Cathy Pargo was not allowed to serve as a jailhouse lawyer because, according to ICIW officials, she had tried to circumvent prison policies in the past and misrepresented herself as a trained paralegal when she was not so trained. (Pls.' Exs. 6, 8–14.) The court finds the officials' testimony to be credible. Gender was not a factor in the Warden's determination to disallow Pargo's participation as a jailhouse lawyer, or in the ICIW policy governing practices of jailhouse lawyers.

#### (2) Legal materials in the library

Plaintiffs claim that the legal materials at ICIW are inadequate, and of a significantly lower volume than at the men's institutions that house long-term inmates.

ICIW has a law library, containing a variety of legal resources. The ICIW collection is not as extensive as the IMR or ISP collection, but both IMR and ISP serve far more inmates than ICIW. ICIW inmates can obtain additional sources from the State Law Library upon request. (Burnell Dep. at 33–34.) Women inmates generally have not been involved in as much litigation as men inmates. (Trial Tr. at 933.) On the whole, longer-term inmates engage in more litigation. (Hedgepeth Dep. at 18.) ICIW has fewer longer-term inmates, whether measured by raw numbers or population percentage, than IMR or ISP. (Appendices B and D.) In addition, women inmates tend to have fewer sentences imposed on them, which also decreases litigation. (Appendix E.) Annual inmate surveys provide suggestions for additions to the library, but no requests for *Shepard's* citation reporters or United States Supreme Court reporters were made through these surveys. (Burnell Dep. at 36.) Of course, the fact that an inmate might not be aware of *Shepard's*, and therefore not request it as research material, would not excuse the failure to provide adequate resources. However, with the availability of the reference librarian who accesses the

State Law Library and its librarian, not having *Shepard's* on-site may not be significant. The system of accessing the State Law Library is used at other institutions, such as IMCC, which also does not carry *Shepard's*. (Burnell Dep. at 13.)

Prison officials were unaware of isolated complaints made to the ICIW librarian, a community college employee working on contract, about inadequacies in the law library because the complaints had not been forwarded by her to prison officials. (Trial Tr. at 698–700.) When officials learned of the complaints and reviewed the inventory, an order for $8,000 worth of materials, including *Shepard's,* was placed in 1994. (Trial Tr. at 700.) The court finds this testimony to be credible.

DOC policy allows discretionary transfers for library use when other alternatives have been explored. (Defs.' Ex. C, IN–V–03.) Contrary to the Plaintiffs' contentions, the court finds credible the testimony that male inmates may be transferred because of security concerns or in order to attend a particular treatment program, but men have not been transferred to ISP in order to use library materials at that institution. (Behrends Dep. at 27; Brandt Dep. at 47; Helling Dep. at 23; Manternach Dep. at 15–16.)

### (3) Law library hours

Plaintiffs claim that they have limited access to library legal materials due to restricted library hours.

Law library materials at ICIW are shelved with the general library collection. The ICIW library is open 57 hours over seven days each week.[34] Law library materials are available during the general library hours. (Burnell Dep. at 5.) Library hours are divided into "open hours," when residents from any unit may visit for any length of time, and "regular hours," when one resident per unit may visit for one-half hour (more than one visit is allowed if no one else from the same

unit is signed out to the library). (Pls.' Ex. 137.) At times, library usage is restricted to certain units. The extra privilege unit can use the library in the evening. Requests for extra library time also are accommodated. (Burnell Dep. at 32; Trial Tr. at 781.)

Although use is limited to 20 people in the ICIW library at any given time, that maximum has never been reached. (Burnell Dep. at 7.) The maximum number serves a legitimate penological interest in maintaining security and in discouraging socializing in the library, where other inmates may be studying or doing legal research. (Trial Tr. at 781–83.)

The court finds the following facts regarding law library hours at men's facilities. At ISP, the library is open 46.25 hours a week, with hours from 8:00 a.m. to 5:15 p.m., Tuesday through Saturday. (Trial Tr. at 533.) Inmates can go to the library during their yard periods. (Helling Dep. at 17.) Only about 30 to 40 inmates can fit in the library at one time. (Helling Dep. at 23.) Inmates in protective custody can go to the library on Tuesdays and Thursdays. (Helling Dep. at 18.) Inmates in administrative segregation can have library materials brought to their cells. (Helling Dep. at 18.)

The library at IMR is open 40 hours a week over a seven day period; law materials are shelved with the regular collection. (Sissel Dep. at 6–7.) Inmates have unlimited access to legal material during open hours, unless the library becomes overcrowded. (Sissel Dep. at 8.) There are limits on the number of inmates allowed to use the library. (Behrends Dep. at 15.) LHWC inmates use the IMR library and medical facilities, 90 miles away. (Trial Tr. at 617.)

There is a separate building that houses the law library at JBCC. (Helling Dep. at 14.) The library is open over five hours each day. The court adopts Plaintiffs' summary of library access hours at NCCF, CCF, and

**34.** The hours are Monday through Friday from 8:30 a.m.—12:30 p.m. (except Tuesday, when it is open until noon); 1:00—4:30 p.m. and 7:00—8:30 p.m. (and also from 5:00 p.m.—6:00 p.m. on Wednesday). Weekend hours are from 9:00 a.m.—noon and 1:00 p.m.—4:30 on Saturday, and 9:30 a.m.—noon and 1:00 p.m.—3:30 p.m.

on Sunday. Library use on Tuesday from 1:00 p.m.—2:00 p.m. is scheduled for Unit 2 intake residents; Saturday from 9:00 a.m.–10:00 a.m. is reserved for inmates in the violator program; and Saturday from 10:00 a.m.—11:00 a.m. is reserved for inmates in the treatment program. (Pls.' Ex. 137; Burnell Dep. at 5.)

MPCF. (Pls. Proposed Findings of Facts at 66, 76.) The library at NCCF is open from 12:30 p.m.—4:15 p.m. and 6:15 p.m.—8:45 p.m. seven days a week. Access to the library is not part of the level system at NCCF. The library at MPCF is open from 8:30 a.m.—3:30 p.m. six days a week. The library at CCF is open seven days a week, but closed during lunch hour. The record does not disclose its hours. No evidence was developed at trial on library hours and access to legal materials at IMCC, CRC, and the Farms.

### (4) Photocopies of legal materials

Plaintiffs claim that their photocopying services for legal matters are not comparable to those provided at certain men's institutions.

Under past practices, women inmates had no restrictions on the amount of copying that could be done. (Trial Tr. at 706–07.) The photocopying was performed by prison support staff. When the photocopying responsibilities became burdensome, the policy was changed. A certain amount of support staff time was designated for photocopying. In order to provide for equitable distribution of the service, a limit was placed on copying. That policy was amended to be consistent with the policy at IMR. Under current policy, inmates can drop off papers to be copied, which is done on a first-come, first-served basis, with court-deadline material given top priority. (Trial Tr. at 708–09.) The ICIW librarian stated that, when making legal copies, "[it has] never come to the point where I had to set a limit" under the current policy. (Burnell Dep. at 39.)

The court finds the following facts regarding photocopy practices by inmates at men's facilities. At IMR, photocopying services are available through the records department, at a cost of 15 cents per copy. (Sissel Dep. at 9–10.) Inmates at IMCC and ISP cannot make their own photocopies. (Helling Dep. at 83; Brandt Dep. at 46.) Limitations on photocopying are not specifically set out at ISP, but inmates are only allowed to keep two boxes of possessions, and photocopies would have to fit within those two boxes. (Helling Dep. at 21.) No evidence was developed at trial on photocopy policies at NCCF,

MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

### (5) Availability of trained law library aides

Plaintiffs claim that ICIW does not offer library aide assistance comparable to men's institutions.

A trained library aide, who can assist with legal research, is scheduled to be in the ICIW library Tuesday and Thursday, from 1:00 p.m.—2:30 p.m. and on Friday from 1:00 p.m.—2:00 p.m. (Burnell Dep. at 8.) ICIW also has a librarian, certified in library management, who is an employee of the Des Moines Area Community College. She is available to assist women inmates at the ICIW library from 10:00 a.m.—3:00 p.m. on Tuesday through Friday. (Burnell Dep. at 5–6.) Although the librarian has no formal training in legal research, she is familiar with the legal materials available; she knows how to use *Shepard's* citations; and she is able to look up cases from citations. (Burnell Dep. at 9–10.) When presented with a legal research question she cannot handle or the need for a copy of a case not available in the ICIW collection, the librarian stated that her procedure is to contact the State Law Library for assistance or to gather information not available in the ICIW law materials. (Burnell Dep. at 10.)

The court finds the following facts regarding availability of law library aides at men's facilities. There is no trained law library aide at IMCC. (Brandt Dep. at 5.) Library aides at ISP are trained with the assistance of the University of Iowa law school. (Helling Dep. at 13.) There is a library aide on-site at IMR who can help inmates find books or order special legal materials through interlibrary loan with the State Law Library. (Sissel Dep. at 10–13.) No evidence was developed at trial on availability of law library aides at NCCF, MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

### c. Annual Classification Reviews

Plaintiffs claim that they are not allowed to meet personally with the ICIW classification review committee, in contrast to the in-person reviews which are held at men's institutions.

Pursuant to DOC policy, classification reviews must be completed at least annually. (Defs.' Ex. C, IN–V–20.2 at 2.) Classifications upon entry to prison at IMCC are assessed after face-to-face meetings, but under DOC policy, an inmate need not be present for subsequent annual reviews. The periodic inmate classification reviews are used for determining job changes, classification actions, and security changes. (Trial Tr. at 864–65.) DOC policy does not require that the inmates be present or that the annual review be conducted in a committee meeting. The policy requires that the opportunity to be present be made available. (Defs.' Exs. C, IN–V–20.1; IN–V–20.2 at 2.)

Before this lawsuit was filed, the ICIW classification committee, consisting of the program director, the security director, and a counselor, met regularly on a variety of matters, including classification decisions. (Trial Tr. at 633–34.) Many of the classification decisions were made without the inmate being present. As the population at ICIW grew, the duties of the committee members changed. Turnover of inmates was very rapid, and many of the classification decisions were made on the basis of the written record. (Trial Tr. at 634, 637.) A counselor routinely made annual classification decisions without personally seeing the inmates. (Trial Tr. at 636.) After an increase in staffing in 1993, ICIW inmates now meet at least monthly with a counselor. (Trial Tr. at 638.) The counselor, therefore, is in a good position to recommend reclassifications, based on information gained through the ongoing relationship with the inmates.

As an example of the policy's impact, Plaintiffs introduced exhibits that describe Cathy Pargo's request to appear before the classification committee on the matter of reviewing the Parole Board decision denying her work release. (Pls.' Exs. 122, 123.) Warden Long denied the request to appear, testifying that a face-to-face meeting would have been fruitless because Pargo had no new information to offer regarding her classification review. According to Warden Long, "Cathy was asking to go home." (Trial Tr. at 939.) The court finds Pargo's request for review of the Parole Board decision on a

matter of work release to be outside the purpose for which the classification policy was adopted. DOC Policy IN–V–20.1 addresses procedures for classifications with regard to work area assignments, treatment programs, and custodial control. Although the inmate's classification may affect parole decisions, the classification committee has no authority to modify a Parole Board decision. If Pargo's goal was reconsideration of a Parole Board decision, the prison officials could not provide relief. If she was concerned about future parole decisions, she could address the issue with her counselor at the regularly scheduled monthly meetings, or before the next annual classification review.

ISP inmates are present for annual classification reviews. (Helling Dep. at 53.) No evidence was developed at trial on annual classification reviews at IMCC, IMR, NCCF, MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

### d. Classification Screening for Jobs

Plaintiffs claim that the method of job assignment significantly differs between ICIW and men's institutions.

Iowa Prison Industries (IPI), a self-supporting division of the Iowa DOC, produces goods for the State of Iowa and its political subdivisions. Iowa DOC, *Annual Report* (1994). IPI simulates the private sector by providing inmates a stable work environment. *Id.* Not all of the State's correctional institutions have IPI facilities on-site. (Wood Dep. at 18.) CRC, NCCF, and CCF have no prison industries because the markets in those areas do not have economies to provide the necessary support. (Halford Dep. at 62.)

Plaintiffs claim gender based disparate treatment in the job hiring procedures for ICIW inmates who want to work for IPI. The crux of their claim is that inmates at IMR are able to contact IPI supervisors and obtain support for job requests, which are approved by the classification committee. That is, at IMR, prison industries supervisors interview the inmates who are interested in particular jobs. If IPI wants to hire an inmate, an IMR counselor is informed. The classification committee decides whether the

inmate can have the position. (Manternach Dep. at 55.)

Under past practices, ICIW allowed inmates to apply for IPI positions by contacting work supervisors directly. (Trial Tr. at 889.) ICIW officials ended this practice when they "were having too many people fall through the cracks either when they weren't looking for a job or work supervisors were maybe not interested in hiring particular people." (Trial Tr. at 889.)

In order to have more organization in the job placement process, ICIW inmates now must meet with correctional counselors, who then communicate with the work supervisors about who is available to work in various departments. (Trial Tr. at 889.) The counselors review job lists provided by IPI and match the criteria for available positions with available workers. (Trial Tr. at 890.) Women inmates at ICIW must gain approval from the classification committee before being interviewed for IPI employment.

In sum, IMR inmates can contact a work supervisor before conferring with a counselor, who takes the job request to the classification committee; ICIW inmates confer with a counselor, then interview with a work supervisor, and then a counselor takes the job request to the classification committee. At both institutions, the classification committees ultimately approve or disapprove job assignments.

### e. Classification Decisions to Segregate HIV/AIDS Inmates

Plaintiffs claim that when men's institutions segregate AIDS/HIV patients, they do so in accordance with DOC "health segregation" policy. With regard to the segregation of an HIV-positive inmate at ICIW, Plaintiffs contend that the segregation is more akin to DOC "administrative segregation."

ICIW standard protocol provides that inmates with infectious diseases who pose a threat can be segregated. (Trial Tr. at 944.) Segregation is warranted for inmates who engage in high risk behavior. (Trial Tr. at 947.) This policy is consistent with DOC policies and is applied without regard to gender.

The ICIW inmate cited as an example by the Plaintiffs was placed in administrative segregation because of disciplinary matters resulting from the inmate's sexually aggressive actions rather than due solely to her HIV-positive status. The inmate had a long and repeated history of sexual misconduct. ICIW officials warned the inmate that the behavior should stop, but it persisted. In response, the infected inmate was assigned to long-term segregation because she had engaged in high risk behavior while suffering a contagious condition. (Trial Tr. at 940–41.) Plaintiffs cite no other example of implementation of the policy at ICIW. Plaintiffs argue the cited example is contrary to DOC policy and varies from practices at men's institutions.

ICIW has not only a legitimate, but also a serious concern for the health and safety of the infected inmate, other inmates, prison staff, and visitors. Warden Long testified that ICIW policy has changed over time as information and procedures have come out from OSHA, the Department of Health, and the DOC medical director. (Trial Tr. at 944.) In managing HIV/AIDS inmates, the Warden takes into consideration hygiene practices, sanitation procedures, laundry procedures, the availability of private rooms, special medical precautions, the behavior of the infected inmate, and numerous other factors to ensure the safety of the inmate and those around her. (Trial Tr. at 944–47.)

Evidence put into the record on classification decisions to segregate AIDS/HIV patients at men's facilities notes that ISP does not segregate HIV inmates unless they pose a risk for dangerous behavior that could infect others. (Hedgepeth Dep. at 12–13.) No other evidence was developed at trial on classification decisions to segregate AIDS/HIV patients at the other men's facilities.

### f. Movie Censorship

Plaintiffs claim R-rated movies are shown at men's institutions but not at ICIW. ICIW officials testified that R-rated movies are not banned at ICIW, but certain movies are restricted if they depict explicit violence or abuse to women. (Long Dep. at 49; Trial Tr. at 1011, 1026.)

The court finds the following facts regarding censorship of R-rated movies at men's facilities. R-rated movies are not shown at IMCC. (Brandt Dep. at 29; Helling Dep. at 90.) Inmates at ISP have cable television because that is the only way to get reception. (Trial Tr. at 532.) The prison provides the most basic cable package, and does not subscribe to movie channels or other special features; therefore, ISP inmates are only able to see the programs available to basic cable subscribers. (Hedgepeth Dep. at 9.) ISP currently does not show movies at all. (Helling Dep. at 90.) No evidence was developed at trial on movie censorship at IMR, NCCF, MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

### g. Access to Counselors

Plaintiffs claim that generally at men's institutions, counselors are required to have periodic face-to-face meetings with inmates. Under past practices at ICIW, no program existed that required periodic counselor contacts with inmates. Prior to 1993, ICIW counselors had very high caseloads and were unable to meet regularly with inmates. In 1993, another counselor was hired, along with a new treatment director, who required inmates at ICIW to meet with a counselor at least once a month. (Trial Tr. at 638.) Although inmates are not supposed to just drop in to see a counselor, they can request meetings with counselors by appointment. (Pitstick Dep. at 35.) In addition, if an inmate stops by without an appointment and the counselor is available, the counselor will meet with the inmate. Pastoral counseling also is available at ICIW by appointment. (Kopatich Dep. at 10.)

The court finds the following facts regarding access to counselors at men's facilities. Inmates at IMCC can see counselors by appointment. (Brandt Dep. at 11–12.) At IMR, inmates see their counselors about once a month. (Manternach Dep. at 8.) Appointments are preferred but inmates can stop by without an appointment if the counselor is available. (Manternach Dep. at 11.) No evidence was developed at trial on counselor access at ISP, NCCF, MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

### h. Access to Canteens

Plaintiffs claim that they are discriminated against based upon gender because of spending limits and the location of their canteen services.

Private vendors provide canteen services at ICIW, ISP, JBCC, and the prison farms. Other institutions have in-house stores.

ICIW formerly ran the canteen as an institutional store, which offered a more limited selection of items than is currently available. (Trial Tr. at 673.) The institutional store was discontinued, and ICIW contracted with a private vendor in order to reduce staff time required to run the store and to avoid price increases. (Trial Tr. at 672–75.) The canteen distribution area is now located in the main administrative building in the passageway that opens to the outdoor common area. Because this area is not secure, ICIW inmates are required to wait outdoors to purchase items from the vendor. A shift supervisor monitors the inmates by video camera in order to meet security concerns.

The canteen at ICIW is open from 6:30 a.m.—8:30 a.m. on Thursday and Friday. Canteen hours are set to avoid class and work schedules. Inmates whose last names begin with A–L have access to the canteen on Thursdays, and inmates whose last names begin with M–Z have access on Fridays. (Trial Tr. at 128.) When implementing the current system, the business manager, security staff, and vendor monitored the lines at the canteen and found there was a long line when the contract vendor initially opened the canteen, but the lines quickly dissipated. (Trial Tr. at 676–77.) The court finds credible the testimony of the prison officials who reported that the lines at the canteen are not unduly long. When questioned at trial about the feasibility of having inmates line up inside the administrative building for canteen services, Warden Long described the problems involved:

> When we had the line inside the building, we had some security problems with that. We had inmates getting strong-armed, their canteens stolen. We had a lot of sexual activity occurring. People meeting down there and officers discovering people doing all sort of things in that hallway

waiting to go into the canteen area.... It would, again, increase the cost of the canteen operation.

(Trial Tr. at 677–78.)

Canteen spending[35] at ICIW is based on the level system and limited as follows: Level A inmates can make hygiene purchases only; Level B inmates are limited to $20 per week; Level C inmates are limited to $35 per week; Level D and E inmates have no limits on spending. (Pls.' Ex. 131.)

The court finds the following facts regarding canteen services at men's institutions.

ISP does not provide a central canteen area, but inmates can order items to be delivered to their cells. They receive an order at least one week after placing the order. ISP canteen services are offered every other week. There is a $100 limit per canteen order, with a spending limit of $100 every two weeks. (Hedgepeth Dep. at 6–7.)

IMR canteen services are provided by the institution, with profits going to an inmate fund used for upgrading commissary and recreation facilities. (Sissel Dep. at 20.) To receive canteen items, inmates fill out a canteen slip and stand in line. (Sissel Dep. at 21.) Efforts were made to reduce the lengths of lines, but due to limitations in the size of the building that houses the canteen area, inmates on some past occasions have had to stand outside while waiting to be serviced for their canteen orders. (Sissel Dep. at 21–23.)

No evidence was developed at trial on access to canteens at IMCC, NCCF, MPCF, CCF, CRC, the Farms, JBCC, and LHWC.

### i. Mathematical Errors in Canteen Orders

Plaintiffs also allege a violation of their equal protection rights because of the ICIW policy that an inmate lose her canteen privileges for the week when an order is not mathematically correct. Canteen orders are filled out by each female inmate. The canteen service provider, an independent contractor with the institution, then fills the orders the morning after the request is made. (Long Dep. at 13–14.) If an order is not added correctly, the inmate cannot receive the canteen items that week.

Prison officials set the rules regarding arithmetic errors because it encourages responsibility by the inmates, and it is a skill that will benefit inmates upon release. (Long Dep. at 18.) It also accommodates the needs of inmates better than the ISP procedure, which always has at least a one week lag time between ordering and receiving items from the canteen. The ICIW canteen vendor fills orders on the day after the order is provided to the contractor. Mathematical errors unnecessarily slow the process. (Trial Tr. at 697–98.)

The court finds credible the prison officials' testimony that few inmates have been affected by the arithmetic rule. Calculators are available for inmates' use, and assistance is available for those who need it. (Trial Tr. at 697–98; Long Dep. at 19–20.)

### j. Long–Term Rehabilitative Treatment

The DOC provides five long-term rehabilitative treatment programs for inmates in the areas of substance abuse, criminal thinking, sex offenders, and special needs. Plaintiffs claim disparate treatment of all ICIW inmates in access to long-term rehabilitative treatment programs provided by the DOC.[36] The court finds the following facts regarding treatment programming offered at ICIW and the men's institutions.

ICIW provides substance abuse programming in compliance with state licensing requirements that set out minimum hours for substance abuse treatment programs. This assures there is no difference in the way men and women are treated in the programs. Most treatment programs are three to four months long. (Coleman Dep. at 22.) Although ICIW offers only licensed inpatient residential substance abuse treatment, inmates can be paroled to an outpatient com-

---

**35.** The parties provided no evidence to compare prices for similar items at the various canteens.

**36.** Plaintiff class claims that only the minimum live-out custody inmates suffer disparate treat-

ment in the substance abuse program. This claim for minimum live-out custody inmates will be considered separately below.

munity treatment program for substance abuse or sexual abuse offenders.

"Criminal thinking" or "Samenow" classes are offered at ICIW. The ICIW program, designed to accomplish rehabilitation goals, is an eight-hour class, with a follow-up support group, working through the Samenow materials. (Brainerd Dep. at 35, 41.)

ICIW does not provide a sex offender treatment program because the number of sex offenders at ICIW is very low. In the past, only one female inmate has been diagnosed as a pedophile. (Trial Tr. at 660–63.) Warden Long said that she was unaware of any women's prison that offered a program similar to the sex offender program offered at MPCF. (Trial Tr. at 665.) Instead, ICIW sex offenders meet with a psychologist for treatment. (Pls.' Ex. 42; Trial Tr. at 664; Brainerd Dep. at 30; Pitstick Dep. at 45.) In addition, women sex offenders have been paroled to a community treatment program. (Trial Tr. at 650, 655; Brainerd Dep. at 30; Pitstick Dep. at 37; Rode Dep. at 79.)

Special needs units and special education programming exist in most of the prison institutions, including ICIW. (Trial Tr. at 508, 651–52.) Inmates who are mentally retarded, or who have other exceptional needs that would preclude them from being mainstreamed, can be housed in the special needs unit. Only a few ICIW inmates have been assigned to special education programs. (Trial Tr. at 508.) Special incentive programs can be individualized, and specialized programming can be developed. (Trial Tr. at 653.) Efforts are made to offer all institutional programs as close to release date as possible because they are considered to be more effective then. (Coleman Dep. at 21.)

The court finds the following facts regarding rehabilitative treatment at men's facilities. Licensed substance abuse programs are offered at most of the prison facilities: MPCF, ISP, LHWC, CRC, CCF, NCCF, and ICIW. (Coleman Dep. at 8.) IMR provides no licensed substance abuse program. (Manternach Dep. at 13.) Most of the men's institutions, as well as ICIW, have voluntary

Alcoholics Anonymous and Narcotics Anonymous programs. ISP and JBCC offer voluntary programs in Project Harmony. (Helling Dep. at 74.) Most inmates at CRC are also participating in the 12-step "The Other Way" (TOW) substance abuse program. One building at LHWC is used for substance abuse treatment and recreation; a licensed substance abuse program is conducted there by two on-site counselors. (Wood Dep. at 8.)

At CRC, the Samenow program is a two-month, four-hour, four-day-per-week course for a group of 12–15 people, combining lectures, individual counseling and homework. (Matthews Dep. at 14–15.) A program in "morals development," similar to the Samenow program, is offered at MPCF. It is offered continuously, with ongoing classroom discussion, readings, and group discussion. Inmates normally attend for about four months. (Roffe Dep. at 9.)

A 12–14 month sex offender treatment program is offered at MPCF. (Roffe Dep. at 23.) At the time of trial, marriage and family relations seminars were being planned at CRC. (Matthews Dep. at 27.) No evidence was developed at trial on rehabilitative treatment at IMCC or the Farms.

### k. Rate of Pay for Work Allowance

Women and men inmates receive an allowance based on the type of work they perform and the time spent at the particular job. Some of the inmates are paid on a per-day basis, others are paid on a per-hour basis.[37] Plaintiffs claim that the top rate of pay for certain male inmates is higher than the top rate for female inmates.

The allowance system at ICIW uses primarily per-hour pay rates because that more accurately reflects the free world that inmates will face upon release. (Trial Tr. at 671.) The pay rates at ICIW range from 38–43 cents per hour for institutional jobs; $2.00 per day for food service in the treatment unit; 41 cents per hour for educational programs; and 41–75 cents per hour for IPI jobs.

---

**37.** Inmates also are given an allowance for attending school or treatment programs in lieu of work, as well as for being in "idle" status.

Male inmates can earn 28–58 cents per hour for IPI jobs at IMR; 50 cents to $2.54 per day at institutional jobs at IMR; 27–50 cents per hour for IPI jobs at ISP, JBCC, and the Farms; and 25–49 cents per hour for institutional work at ISP, JBCC, and the Farms; $1.60–4.00 per day at NCCF; $1.05–3.35 per day at IMCC; $1.50–4.00 per day at MPCF; $1.40–6.10 per day at CCF; and $1.00–4.00 per day at CRC. (Defs.' Answer to Interrogs. Nos. 132, 133, 134, 135.)

There is a wide variation in the type of work, the hours of work, and the rate of pay for the varied jobs available.[38]

### 1. Educational Opportunities and Vocational Training

Plaintiffs claim that they receive fewer educational opportunities and are slighted in vocational training when compared to the number and variety of classes offered at the men's institutions.

All Iowa DOC institutions offer core educational courses that are taught by institutional or community college personnel, or a combination of the two. Courses include literacy training; Adult Basic Education (ABE); GED or high school equivalency; and social skills training. (Defs.' Ex. C, IN-V–02; Trial Tr. at 465, 466, 509; Roffe Dep. at 39; Burt Dep. at 80.)

In addition to the core training courses, DOC institutions that are located near community colleges also provide vocational training or vocational-preparatory career training through the community college. (Trial Tr. at 467, 472.) IMR offers vocational training in janitorial, welding, and auto body repair. (Trial Tr. at 573.) IMR vocational courses usually run about six months. (Trial Tr. at 574.) A variety of vocational courses are available at ICIW and CRC because of the proximity of nearby community colleges. (Trial Tr. at 472–73.)

Because of a special contract with Kirkwood Community College, IMR offers college courses via television. No teachers appear in person at IMR to teach classes. (Trial Tr. at 558–59.) Connections to the fiber optics network were to be completed at MPCF in 1994. As of the time of trial, there was no fiber optics connection at ISP. (Helling Dep. at 85.)

Funding for additional training is provided through the State Department of Education, with the course offerings determined by the community colleges, the institution involved, and the DOC. (Trial Tr. at 464–65, 472–73.) Some college courses or community college courses have been offered at ICIW, IMR, and NCCF. (Trial Tr. at 31–32, 470–71, 479; Matthews Dep. at 26; Manternach Dep. at 30–33.) Inmates must pay their own tuition for these courses. (Manternach Dep. at 33.) Other life skills courses also have been offered at various institutions. (Burt Dep. at 73–78, 83–84.)

The women's prison has moved from secretarial training to a wider variety of vocational training. ICIW offers vocational training in dietary aide; commercial painting; roofing, sewers, and electrical maintenance; as well as a course on word processing and keyboarding. (Rode Dep. at 42.) Inmates who have completed the ICIW courses in dietary aide and commercial painting are prepared to move on to more advanced courses and union apprenticeships upon release. (Trial Tr. at 494.) The vocational training at ICIW is designed to provide inmates with marketable skills, not just to fill their time. (Trial Tr. at 510.) Re-entry and job skills classes are offered before inmates are released. (Rode Dep. at 51.) One counselor testified that she had never felt the need to transfer an inmate out of ICIW for vocational training. (Pitstick Dep. at 13.)

Because women inmates generally serve shorter sentences than men inmates, the vocational programming at ICIW is shorter. (Trial Tr. at 482.) At ICIW, most vocational programs take about ten weeks to complete; at ISP, vocational programs take about 12 months to complete; at IMR, vocational programs take about six months to complete; MPCF, NCCF, and LHWC have no vocational training programs. (Trial Tr. at 483–84; Manternach Dep. at 45, 49; Helling Dep. at 53–54, 57–58, 62–63; Roffe Dep. at 39; Burt Dep. at 85; Wood Dep. at 50.) Inmates will not be placed in an educational program

---

**38.** The evidence presented did not allow for an analysis of whether jobs were comparable.

they will not have enough time to complete. The shorter programs are not necessarily of lower quality. For example, a cooking course at ISP, which lasts about 12 months, may not be as valuable to the inmate student as the broader dietary aide course at ICIW, which lasts about ten weeks and produces a readily marketable skill. (Trial Tr. at 491–93.)

Despite Plaintiffs' claims to the contrary, the court finds credible the testimony by prison officials that a high school diploma and a GED are of comparable value. (Trial Tr. at 469–70, 642–43.) Participating in the GED course offered at ICIW generally may be more valuable than participating in a high school diploma course. (Trial Tr. at 498.) Because the GED course takes less time to complete than a high school diploma course, there is an increased chance of an inmate completing the program. GED is a competency-based program that is nationally standardized, whereas high school courses vary. Finally, completion of a GED often reveals an inmate's determination toward self improvement.

**m. Rehabilitation—Gender Self–Esteem**

Plaintiffs claim that "defendants are subjecting its members to disparate treatment because the ICIW inmate level system for women is detrimental to a woman's self-image as a woman and as a person while men are not being subjected to similar treatment as to their self-image as a man and as a person." (Pls.' Proposed Findings of Facts at 37.) Plaintiffs' theory is that there are no DOC policies or practices that lessen a male prisoner's self-esteem; in contrast, not allowing certain female inmates to express themselves with personal clothing, jewelry and makeup, or to get permanents and chemical treatments for their hair is a violation of equal protection.

Positive self-esteem is an important part of an inmate's rehabilitation process, without regard to gender. The privilege level system in place at ICIW limits the various privileges available. The rationale behind using a level system was to provide incentives for good behavior in an institution that houses every security level. Most inmates at ICIW are allowed, within appropriate guidelines, to wear personal clothing, jewelry, and makeup, and to get chemical treatments for their hair. All men's institutions have greater restrictions on makeup and jewelry; regulations relating to personal clothing and hair treatment vary widely among the men's institutions.

Plaintiffs make an insupportable assertion that male inmates do not concern themselves with self image, or that image is less important to them. This assertion is made in the attempt to convince the court that "self-esteem" privileges are more pertinent to female inmates than to male inmates, or that the use of makeup, jewelry, and permanent waves are the pathways to solid self-esteem for females.

The court finds that women inmates do not have fewer "self-esteem" privileges than men inmates.

**n. Level A of the ICIW Inmate Level System**

After trial was held in March and April of 1994, the ICIW administration adopted a "level system." The record was reopened for two days in June and July of 1994 to take additional evidence concerning Plaintiffs' claims that the level system constituted disparate treatment of the women inmates. The court denied Plaintiffs' motion to enjoin implementation of the level system, holding that women and men inmates were not similarly situated, no irreparable injury had been demonstrated, no gender discrimination had been established, and the level system was rationally related to legitimate goals of security and rehabilitation.

ICIW's five-tiered level system is designed to "promot[e] positive behavior and constructive program development." (Pl. Ex. 131.) Privileges are tied to inmate behavior. This rating is separate from an inmate's custody score, although certain privileges are also affected by custody score (gate passes, MLO status, furlough). The assignment to a certain privilege level is made by the ICIW classification committee. An inmate is assigned to a Level B classification upon entry to ICIW and can progress to Levels C through E, based on good behavior and the type of sentence being served. Most inmates

are in levels B and C. Inmates who have disciplinary problems are reclassified to Level A, which has the most restrictive privileges. In Level A, inmates must wear state-issued jumpsuits, are limited to two visits per week, one phone call, hygiene-only canteen, and one hour of exercise per day in a restricted yard. At Level D, an inmate must meet DOC criteria for a gate pass, and at Level E, an inmate must meet DOC criteria for MLO status. Inmates of each level generally are housed together in one dormitory. (Pls.' Ex. 131.)

The court finds the following facts regarding the incentive level systems at certain men's facilities. ISP has a "privilege level system" that relates privileges to institutional behavior. The ISP system has more restrictions on inmates with disciplinary problems. (Pls.' Ex. 133.) The "honor lifers" have special privileges, such as phone usage, personal property, special visitation provisions, a washer and dryer, and an annual banquet to which the inmate may invite two guests. There is currently a waiting list for the program because it has a capacity of only 44 inmates. (Trial Tr. at 516–18.)

NCCF and IMR also have five-tiered level systems similar to that adopted by ICIW; they base privileges on institutional behavior and the type of sentence the inmates are serving. (Pls.' Exs. 134, 136.)

The classification level system at NCCF is tied to each living unit, and various privileges at each level. (Hawkins Dep. at 4–8.) No minimum live-out option is available. Privileges at NCCF include possession of personal televisions, radios and tape players, books and magazines, yard and gym time, and hobby craft activities seven days a week.[39] (Burt Dep. at 24, 46–47, 54; Hawkins Dep. at 9.) Telephone privileges include unlimited calls; calling times vary according to the security levels of the inmates. Room lock up at night applies only to some inmates; times

vary depending on the security level of each inmate. (Burt Dep. at 56–57.)

Inmates at IMR are assigned to various areas based on their security levels and, due to crowded conditions, available space.[40] (Behrends Dep. at 6.) At IMCC and IMR, inmate level systems are in place where male inmates, based on their institutional conduct and behavior, can improve their institutional housing and enhance their privileges. The IMCC system is used to encourage good behavior; therefore, occupancy conditions for male and female prisoners at IMCC vary. (Brandt Dep. at 36.)

There is no level system at MPCF. All general population inmates are treated the same with respect to clothing and recreation. Inmates can wear personal clothing that accords with guidelines (solid t-shirts, blue jeans, socks, underwear, tennis shoes). (Roffe Dep. at 65.) A "minimum-outs" program provides certain advantages in work assignments to inmates with good behavior, although these inmates still reside with others in the general population.

All institutions with privilege level systems provide for the most restricted privileges when inmates are disciplined. Not all level systems set out disciplinary actions as a component of the level systems, but all institutions restrict housing (and sometimes programming) based on disciplinary action. Plaintiffs' claims about restrictions ignore the fact that ISP and IMR inmates are housed in cellblocks in walled institutions more than a century old. "Better" housing is relative to one's surroundings. All ICIW inmates are housed in an institution clearly less onerous than most male inmates, and have somewhat "better" conditions than most medium and maximum security male inmates.

### o. Visitation

Plaintiffs claim disparate treatment because of the ICIW policy requiring inmates to register their non-family visitors on a yearly basis. ICIW limits visitation by non-

**39.** Nearly all of the NCCF inmates are designated minimum custody. (Appendix C.)

**40.** Because the different security level areas at IMR were designed for about 700 prisoners, there are some inmates who normally would qualify for particular level privileges, but are not

transferred to that area because of a shortage of space. (Manternach Dep. at 24.) For example, a maximum of 30 inmates serving life sentences can be placed in the minimum security level area.

family members to only two persons, which is consistent with DOC policies. (Trial Tr. at 678; Defs.' Ex. C, IN–V–122 at 2.) Generally, visits are limited to times when the inmate is not working or in school, which approximate the situation the inmate would experience outside the institution. At ICIW, it is not necessary for a child to be escorted for a visit. ICIW inmates may eat with their children under age 12. (Trial Tr. at 681.) Most institutions have rules prohibiting eating with visitors.

The court finds the following facts regarding visitation at certain men's facilities. ISP visitation is governed by the *Hazen* consent decree. At ISP, inmates are limited to four visits per month. No food can be brought in and visitors cannot eat with inmates. (Trial Tr. at 525.) Visits need not be arranged in advance at ISP. (Helling Dep. at 80.)

At IMR, inmates are allowed to designate two friends to visit, with a limitation of no more than five visits per month. (Trial Tr. at 560.) Limits are placed on visitors because of the large number of inmates and concerns about security. (Trial Tr. at 560.) No unaccompanied minors are allowed, and no visitors can eat in the dining hall or visiting room. (Trial Tr. at 560.)

At LHWC, visitation is available Monday—Friday from 6:00 p.m.—9:00 p.m. and weekends from 1:00 p.m.—9:00 p.m. (Wood Dep. at 42-43.) There is a limit of four weekend visits per month. (Wood Dep. at 41.) Visitors can bring food. Inmates can change the names of the two visitors allowed. New visitors generally can be approved within 30 days. In the summer, LHWC inmates are allowed to eat at picnic tables with visitors. (Trial Tr. at 566.) During the rest of the year, visits are allowed in the dining area. (Wood Dep. at 42.)

At the Farms, visitors are allowed all weekend. Inmates can eat noon meals with visitors. (Helling Dep. at 12.) No evidence was developed at trial on visitation at IMCC, NCCF, MPCF, CCF, and CRC.

### 2. Conclusions of Law

Even though women and men inmates are not similarly situated, the court has examined the programs and policies for a rational connection to legitimate state interests, and has searched for any invidious discrimination. The court makes the following conclusions.

■ Classification scores made according to DOC policy are gender neutral in design and application. There is a rational basis for prison officials to classify prisoners in order to accommodate security and rehabilitation interests. ICIW inmates suffer no disparate impact as a result of the classification system. The Parole Board recognizes movement to better security levels within ICIW in the same way that it recognizes physical transfers to various men's institutions. The court discerns no invidious intent in establishing a classification system. To the contrary, classification can reduce potential security risks and can facilitate rehabilitation programs offered to Iowa inmates.

■ The court concludes that DOC policy regarding legal assistants is gender neutral in design and application. Women and men inmates operate under substantially the same policies. The policies are rationally related to legitimate state interests in security and rehabilitation, and ensure inmates access to the courts. The court has found no evidence of invidious discrimination.

■ The court concludes that women and men inmates have adequate and substantially similar access to library materials in their respective institutions. Although there are some differences in library hours among the institutions, the court concludes that prison libraries are open a suitable amount of time so that inmates can access the courts. Policies are gender neutral in design and application. The decision to limit hours and limit numbers of inmates at some of the law libraries is rationally related to a legitimate governmental interest in security. In addition, the court concludes that ICIW prison officials have made reasonable efforts to provide an adequate library, to facilitate the use of a trained library aides, and to provide for access to sources outside the institutional library. The court has found no evidence of invidious discrimination.

■ The court concludes that policies regarding photocopying are substantially simi-

lar in women's and men's institutions. Regulations on photocopying are gender neutral in design and application. The policies are rationally related to legitimate state interests in security and control of the institution, while accommodating inmates' needs to access the courts. The court has found no evidence of invidious discrimination.

The court concludes that DOC policies regarding annual classification reviews are gender neutral in design and application, and that there is substantial parity between women and men inmates. ICIW policies provide for regular contact with counselors, allow in-person meetings, and are rationally related to legitimate state interests in accommodating staffing and security needs, rehabilitation, and inmate concerns. The court has found no evidence of invidious discrimination.

The court concludes that classification screening for jobs is substantially similar for women and men inmates. Inmates must talk with a counselor and a work supervisor. The classification committee makes the final decision for both men and women inmates. The policy is gender neutral in design and application and is rationally related to legitimate interests in security and rehabilitation. The court discerns no invidious discrimination.

The court concludes that HIV/AIDS policies at women's and men's institutions are similar. ICIW follows DOC policy, which is gender neutral in design and application. The DOC has a strong interest in protecting inmates, staff, and others from possible infection. The policies are rationally related to that legitimate state interest. The court has found no evidence of invidious discrimination.

The court concludes that policies regarding censorship of movies are substantially similar for women and men. Policies are gender neutral in design and application. Censorship policies are rationally related to legitimate penological interests in security and rehabilitation. The court discerns no invidious discrimination.

The court concludes that access to counselors is substantially similar for women and men inmates. Policies are gender neutral in design and application. The prisons have penological interests in providing access to counselors in order to further the dual goals of security and rehabilitation. The court has found no evidence of invidious discrimination.

The court concludes that there is substantial parity between women and men in their access to canteens. Specific policies vary according to the particular needs of an institution, and those policies are rationally related to legitimate state interests in providing reasonable access to canteen items at low cost, while maintaining security in the prison. In addition, the court concludes that the requirement for canteen orders be calculated correctly is rationally related to legitimate penological interests. The policy allows immediate delivery of canteen items by the vendor and serves rehabilitative goals in preparing inmates for life outside of prison. The court discerns no invidious discrimination with regard to canteen services.

The court concludes that there is substantial parity in the programming offered to women and men inmates. Women have access to essentially the same programming available to men, either through the prison or through parole to outpatient treatment. The court concludes that prison officials have articulated gender neutral reasons for developing programming at the women's and men's institutions, based on needs of inmates, length of sentence, and resources available at each institution. Policies, procedures, and programs are gender neutral in design and application, and are rationally related to legitimate state interests. The court discerns no invidious discrimination.

The court concludes that wage rates are gender neutral in design and application. Prison officials have made efforts to provide non-traditional training and job opportunities for women inmates. The court concludes that women are paid substantially the same as men. Work policies are rationally related to legitimate state interests in security and rehabilitation. The court discerns no invidious discrimination.

■ The court concludes that educational and vocational opportunities are substantially similar for women and men inmates, and that DOC policy is gender neutral in design and application. Although not every vocational program for men is made available for women (and vice versa), there is a rational relationship between the policies and the legitimate penological interest in providing programs appropriate to the population of a particular prison. The court concludes that Iowa prison officials have provided programs based on available resources and inmate demand. The court discerns no invidious discrimination.

The court concludes the Plaintiffs' claims regarding gender self-image are specious. Prison regulations regarding clothing, jewelry and makeup are rationally related to legitimate state interests in security. In fact, women inmates are provided more freedom than male inmates in this regard. The court discerns no invidious discrimination.

■ The court concludes that the use of the privilege level system, including "Level A" at ICIW, is substantially similar to systems used in other prisons, notably IMR and ISP. The policy is gender neutral in design and application. The policy is rationally related to the legitimate penological interest in providing incentives for good behavior, and in providing greater restrictions for inmates who pose security risks. The court discerns no invidious discrimination.

■ The court concludes that visitation policies are substantially similar for women and men and are gender neutral in design and application. Any differences are rationally related to the legitimate state interests in security and rehabilitation. Special accommodations can be made for any visitation, so long as it does not pose an undue security risk. The court discerns no invidious discrimination.

Based on these findings of fact, the court concludes that the challenged policies applicable to all inmates are gender neutral in design and application and rationally related

to legitimate governmental interests in the security for inmates, staff, visitors, and the public, as well as rehabilitation of the inmates. The court has found no evidence of any invidious discrimination.

### B. Claims Applicable to Minimum Live–Out Security Inmates

Plaintiffs claim that they have a lower placement rate and fewer privileges in their minimum live-out unit when compared to men's institutions.

There are minimum live-out (MLO) [41] facilities at ICIW, LHWC, the prison farms, and CRC. The ICIW MLO facility was opened when the fence was installed at ICIW in 1993. There are no MLO facilities at MPCF, CCF, IMCC, or IMR. Men who qualify for MLO are transferred from another institution to LHWC, the prison farms, or CRC. Women who qualify for MLO are reassigned to the MLO unit outside the fence at ICIW. At the time of trial, 17 inmates lived in MLO at ICIW; the maximum capacity is 40 inmates. (Trial Tr. at 608.)

The Department of Corrections does not include in its security levels a designation for MLO. Rather, the policy is set out in departmental rules. (Defs.' Ex. C, IN–V–20.2.) ICIW uniformly applies these policies. Minimum live out is one option for inmates who fit within the minimum security classification. It is not a prerequisite to parole. Women inmates often are paroled before they have the opportunity to be transferred to the MLO facility at ICIW. (Trial Tr. at 837.) Even though women and men inmates in the MLO classification are not similarly situated, the court has examined the programs and policies for a rational relationship to legitimate state interests, and has searched for invidious discrimination.

#### 1. Findings of Fact

Based on the following findings of fact, the court concludes that the challenged policies are gender neutral in design and application and are rationally related to the State's legitimate interests in security for inmates, staff,

---

41. MLO means that the inmate is housed in a facility that has no perimeter fence or wall. (Trial Tr. at 434.) Pursuant to DOC policy, inmates must be within a year of release to qualify for MLO.

visitors, and the public, and rehabilitation of inmates. The court has found no evidence of any invidious discrimination.

### a. Percentages of Women and Men Inmates Classified to Minimum Live–Out Housing

Plaintiffs claim that by percentage of population, twice as many men inmates are classified to minimum live-out status as are women. According to Plaintiffs, the only explanation for this is that criteria for classifying women into minimum live-out security are different from the criteria for classifying men.

The court finds that about 8% of the male inmate population is classified to MLO facilities, and about 8% of women inmates are classified to ICIW's MLO facility. (Appendix A.) There is no statistical disparity. In addition, the court finds that ICIW follows DOC policies in making the MLO classifications. Those DOC policies are gender neutral.

Women inmates are not directly assigned to ICIW's MLO facility, but instead are assigned to ICIW and then reclassified. This is comparable, for example, to LHWC's MLO inmates, who first are processed at IMR before transfer to MLO. The court finds that women and men are treated substantially the same in their MLO classification.

### b. Housing and Programming

Plaintiffs allege that housing arrangements are different for women MLO inmates at ICIW than for men in MLO facilities at CRC, LHWC, and the prison farms. The ICIW MLO unit is located just outside the perimeter fence. (Trial Tr. at 616.) CRC, LHWC, and the prison farms are not physically connected with another facility; that is, they operate independently from a walled prison.

Although the women in the MLO at ICIW are not completely separated from the general population, they have additional privileges not available to inmates inside the fence and are given greater freedom of movement during the day and night, as are men inmates at other MLO facilities. Some male inmates

assigned to MLO are required to relocate to a secure institution for programming, such as substance abuse treatment. (Halford Dep. at 67.)

Plaintiffs claim they are burdened by having to attend activities, programs, and work assignments inside the fence with the general population. The court finds credible the observation by Warden Long that if ICIW were to isolate MLO inmates from the general population, the decision would be unpopular and there would be a "gigantic uproar." (Trial Tr. at 616.) By mixing the populations, MLO inmates are able to socialize with their friends in the general population; they have use of the on-site library and medical care provided to the general population; and they are able to participate in organized recreation activities that would not be practical with the small MLO population. (Trial Tr. at 617.) MLO inmates at certain men's facilities, such as LHWC, have to spend nearly a whole day away from their MLO site in order to use a library, see a chaplain, or get medical care. (Trial Tr. at 617.)

Allowing MLO inmates to attend programming at ICIW increases their programming and services options. Because ICIW is a relatively small institution, and only a small number of inmates can qualify for the ICIW MLO, there are not enough inmates to populate separate programs, so the MLO inmates attend classes with other inmates. (Trial Tr. at 608, 615–16.) Efforts are being made to expand separate programming for MLO inmates at ICIW, but the majority of the programs will be inside the fence.

### c. Institutional Off–Grounds Work Opportunities

ICIW generally provides jobs at the prison for female MLO inmates. In contrast, CRC regularly sends male inmates to job sites in Des Moines and Ames.[42] Plaintiffs claim this constitutes gender based disparate treatment.

The ICIW practice is due in part to the fact that women inmates generally receive similar on-site job assignments in painting and general labor as are available off-site. The court finds credible Warden Long's opin-

---

**42.** Not all men inmates assigned to MLO have jobs off-site. (Halford Dep. at 58.)

ion that there is little practical difference between jobs on-site at ICIW and jobs outside the institution. (Trial Tr. at 612–13; Long Dep. at 35.) Off-site jobs have, in the past, been provided on a limited basis to women inmates when the opportunities were appropriate. (Long Dep. at 32.) However, if similar opportunities are available on-site, concerns for security are lessened. In addition, mixing men and women inmates off-site would require greater supervision. Prison officials have a security concern whenever inmates are off-site. Increased security needs for worker supervision off-site would reduce on-site opportunities for other inmates.

### d. Yard Time and Yard Privileges and Opportunities

Plaintiffs claim that at men's MLO facilities, yard privileges are exercised outside secured perimeters, whereas ICIW MLO inmates use the yard inside the perimeter fence. The court finds that MLO inmates at ICIW also have their own separate exercise yard, with a tennis court and a softball diamond. The MLO yard is available from dawn to dusk.

MLO inmates benefit from participating in programming inside the perimeter fence, as well as using the yards inside the perimeter fence. The perimeter fence at ICIW was designed to provide more flexibility in yard usage. MLO residents can take advantage of the walking paths, exercise stations, and activities with other inmates available inside the perimeter fence. (Trial Tr. at 616–17.) Although the MLO yard provides modest equipment, it is adequate for an inmate's exercise, and is supplemented by access to the yard and gymnasium inside the fence.

### e. Library Access

Plaintiffs single out CRC library hours to support the claim that certain men MLO inmates have twice as much library access time than ICIW MLO inmates. The court finds that CRC provides generous library hours, being open from 8:00 a.m.—11:00 p.m. seven days a week. The record was not developed, however, as to what the CRC library holds, or the extent of its legal material. Plaintiffs also acknowledge that LHWC has no library facility for its MLO inmates.

(Trial Tr. at 617.) At LHWC, there are some books available, but for legal research, men inmates must travel to IMR or IMCC, spending a day away from LHWC while they complete their research. LHWC inmates can also request that law books be brought to them by staff making a trip to IMR or IMCC. No evidence was developed at trial on library availability for MLO inmates at the prison farms.

During their free time, MLO inmates can go to the ICIW main library any time the facility is available. Extra time can be granted for a school project or legal research. (Trial Tr. at 781.)

### f. Furloughs for Minimum Live–Out Inmates

Plaintiffs argue that over a three-year period, 592 male MLO inmates were granted furloughs, while during the same period, no ICIW MLO inmates were granted furloughs. The DOC policy on furloughs applies to all MLO facilities, and has strict requirements for eligibility. (Trial Tr. at 615; Defs.' Ex. C, IN–V–44 at 3.) Although some women MLO inmates are ready for parole, between one-half and three-fourths of the women MLO inmates are not there as pre-parole or pre-release inmates. Women at ICIW receive fewer furloughs than men inmates because women are paroled to work release when they are close to release, provided that they are not subject to mandatory minimum sentences. (Trial Tr. at 614; Long Dep. at 44, 46.) Plaintiffs presented no evidence about any woman inmate who qualified for, requested, and was denied a furlough. The court finds credible Warden Long's observation that due to lengths of sentences and lengths of stay for women prisoners, by the time many MLO inmates meet all the strict furlough criteria, they already have been released. (Trial Tr. at 614.)

### g. Visitation for Minimum Live–Out Inmates

Plaintiffs claim gender based disparate treatment because men's MLO facilities allow visitation in an unfenced setting. ICIW MLO residents receive visitors in the visiting room located in the administration building,

which is used by the general population inside the perimeter fence.

The court reaffirms the factfinding regarding visitation, discussed in section III(A)(1)(o) above, because it applies to MLO inmates. MLO inmates meet with visitors at the visitation center at ICIW, rather than at the MLO facility outside the perimeter fence. The difference in meeting in the visitation center or in another location is not substantial.

### h. Substance Abuse Programs for Women and Men Minimum Live–Out Inmates

Plaintiffs claim gender based disparate treatment because substance abuse treatment for certain MLO inmates at CRC and LHWC is conducted on an outpatient basis. The treatment program at ICIW operates on-site outside the fence as an inpatient program. (Coleman Dep. at 11; Halford Dep. at 52.) Women inmates may be sent to outpatient programs when they are paroled. At ICIW, MLO inmates who participate in the substance abuse program must reside in a separate substance abuse treatment building with others in the program and thereby forgo for 90 days some of the privileges enjoyed by the MLO inmates not participating in the program.

Substance abuse programming at the different DOC facilities was discussed in Section III(A)(1)(j) above, and the court reaffirms those findings of fact. Licensed residential substance abuse treatment programs are the same for men and women. (Coleman Dep. at 6–7.) The programs, licensed by the Iowa Department of Public Health, require the same number of hours of programming. (Coleman Dep. at 13, 18.) The program takes about three months to complete. (Coleman Dep. at 22.) Inmates enter the program near the time of their release dates because that is viewed favorably by the Parole Board. Also, research indicates that the program is most successful when it is completed near the time of release. (Coleman Dep. at 21.)

Such programs are in place at ICIW, MPCF, ISP, CRC, CCF, LHWC, and NCCF. (Coleman Dep. at 8.) All inmates in the programs live together at ICIW, CCF, and MPCF. (Coleman Dep. at 11.) One building at LHWC is used for substance abuse treatment and recreation. A licensed outpatient substance abuse program is conducted there by two on-site counselors. (Wood Dep. at 8.) CRC has a licensed residential substance abuse program. All participating inmates in that program are housed together. (Coleman Dep. at 8, 11.)

### 2. Conclusions of Law

Even though women and men inmates in the MLO classification are not similarly situated, the court has examined the programs and policies to determine whether they are rationally related to a legitimate governmental interest, and has searched for any invidious discrimination.

■ The court concludes that similar percentages of men and women are classified to MLO facilities. MLO classifications are based on DOC policies that are gender neutral in design and application, and are rationally related to legitimate penological interests in security and rehabilitation. The court discerns no invidious discrimination.

■ The court concludes that housing MLO inmates in a facility just outside the perimeter fence is not a gender based decision. Adjacent housing permits more access to programming, which is rationally related to the legitimate state interest in rehabilitation, while also accommodating legitimate security interests. Women MLO inmates have greater access to programming, library, and medical services as a result of their proximity to ICIW. The court discerns no invidious discrimination.

■ The court concludes that work opportunities for MLO inmates are substantially similar to the opportunities for men. In addition, the court concludes that work opportunities for women inmates are equivalent to the opportunities for men. The court does not find that off-site jobs are more valuable than on-site jobs, given that most off-site jobs are common laborer positions. The court finds that the ICIW allocation of resources in providing on-site job opportunities is rationally related to the legitimate governmental interests in security and rehabilita-

tion. The court discerns no invidious discrimination.

■ The court concludes that women MLO inmates have yard time and yard privileges similar to male MLO inmates. ICIW MLO inmates have a separate yard and, although it is somewhat limited, the proximity to the main ICIW institution expands the opportunities for women inmates. Yard policies are gender neutral in design and application. The policies are rationally related to legitimate governmental interests in security. The court discerns no invidious discrimination.

■ The court concludes that library access is at least equivalent for women and men MLO inmates. In fact, women MLO inmates have greater library access because the ICIW library is better equipped than at some men's MLO facilities, and extra library time can be arranged for inmates who need it. The policies are gender neutral in design and application. The policies are rationally related to legitimate governmental interests in security. The court discerns no invidious discrimination in library access.

■ The court concludes that furlough policies are applied equally to men and women. DOC policies are gender neutral in design and application. The lack of furloughs for women inmates is attributable to the strict requirements of the policy and the fact that many are paroled before qualifying for furloughs, rather than to any discriminatory policy. Furlough policies are rationally related to legitimate penological interests in security, public safety, and rehabilitation. The court discerns no invidious discrimination in furlough policies.

■ The court concludes that visitation is substantially similar for women and men inmates. The policy is gender neutral in design and application. Although women MLO inmates cannot receive visitors in an unfenced area, that difference is not significant. Moreover, selection of visitation areas is rationally related to legitimate governmental interests in security for MLO residents, visitors, and others. The location of the visitation area at ICIW was chosen on the basis of security rather than gender based. The court discerns no invidious discrimination in MLO visitation.

■ The court concludes that MLO substance abuse treatment programs are substantially similar for women and men inmates. The policies are gender neutral in design and application. Inpatient substance abuse programming is available for women and men, and program requirements are the same for all licensed inpatient programs. Although ICIW does not provide outpatient substance abuse programming for women, it is available as a condition of parole for women inmates, who generally are released sooner than men. Decisions about treatment programs are based on clinical guidelines rather than on gender and are rationally related to legitimate governmental interests in security and rehabilitation. The court discerns no invidious discrimination in access to treatment programs.

Based on these findings of fact, the court concludes that all of the challenged policies relating to MLO inmates are gender neutral in design and application, and are rationally related to legitimate governmental interests in security for inmates, staff, visitors, and the public, and in rehabilitation of the inmates. The court has found no evidence of any invidious discrimination.

## C. Claims Applicable to Minimum Security Inmates

### 1. Findings of Fact

Plaintiffs raise seven claims regarding minimum security inmates, relating to classification of inmates to MLO, work opportunities off-site, yard time and yard privileges, library access, hobby craft access, phone privileges, and canteen privileges. Even though women and men inmates in the minimum security classification are not similarly situated, the court has examined the programs and policies for a rational relationship to legitimate governmental interests, and has searched for any invidious discrimination.

Based on the following findings of fact, the court concludes that the challenged policies are gender neutral in design and application and are rationally related to the State's legit-

imate interests in security for inmates, staff, visitors, and the public, and rehabilitation of inmates. The court has found no evidence of any invidious discrimination toward women minimum security inmates.

### a. Percentages of Men and Women Inmates Classified to Minimum Live–Out

Plaintiffs repeat the claim made for MLO inmates that there is gender disparity because a larger percentage of minimum security men inmates than women inmates progress to minimum live-out status during their periods of incarceration. Because Plaintiffs raise no new issue, the court reaffirms its findings and conclusions made in Section III(B)(1)(a).

### b. Off Institutional Grounds and Off Secured Perimeter Work Opportunities

Plaintiffs claim gender based disparate treatment because NCCF and CRC allow certain inmates to work outside of the secured perimeter, and in some cases off the grounds of the institution; MPCF allows certain inmates to work outside of the secured perimeter ("minimum work out"), but generally not off grounds. The court reaffirms the findings of fact set out in Section III(B)(1)(c). ICIW allows certain inmates to work outside of the secured perimeter, but does not have a regular off-site work program. At ICIW in the past, very limited requests for off-site work assignments had been accommodated, such as sending work crews to Des Moines. (Long Dep. at 33.) According to Warden Long, a stumbling block in setting up off-site work positions is the length of stay of inmates who would qualify to leave the grounds of the institution. Employers want workers who will stay for a long time, so that they can be trained. (Long Dep. at 34.)

### c. Yard Time and Yard Privileges and Opportunities

Plaintiffs claim gender based disparate treatment because NCCF, MPCF, and CCF have different yard times and yard privileges than are available at ICIW. Women inmates at ICIW who have jobs are eligible for yard time from dawn to dusk; inmates without jobs have yard time from 1:00 p.m. to dusk. (Trial Tr. at 682–83.)

Yard privileges at ICIW were more restricted than at other institutions before the security fence at ICIW was completed. Many security concerns have been reduced now that there is a secure perimeter fence, but restrictions and staff supervision are still necessary in common recreation and leisure areas. For example, writing materials are not allowed in the yard. (Long Dep. at 26.) Paper and pens are prohibited from the yard because they can be used to pass notes to the outside. Notes also could form the basis for a fight. Several security levels mix in the yard, and pens and pencils could be used as weapons in a fight. Because there are no guard towers at ICIW, these security concerns take on greater significance. ICIW inmates are allowed to take one book, one radio, one can of pop, and one package of cigarettes to the yard. (Trial Tr. at 788.)

Within the perimeter fence at ICIW, there are outdoor recreation areas for softball, sand volleyball, extended walking paths, and fitness training at exercise stations. Inmates also are allowed to play with Frisbees® and Nerf® balls.

An indoor gym is available to the entire ICIW population at different times. The gym has a weight machine and exercise bike. The activity director schedules games and open gym. If an inmate's work schedule conflicts with the gym hours, the inmate may not be able to use the gym daily, but will have access to the yard.

The court adopts Plaintiffs' summary of yard times and yard privileges at ISP, NCCF, MPCF, CCF, IMCC, and IMR. (Pls.' Proposed Findings of Facts at 63–64, 74–75.) NCCF allows yard privileges from dawn to dusk. Outside facilities include a softball field, horseshoe pits, and a weight area with an outside enclosure. Running and jogging are permitted in the yard. Musical instruments, writing materials, and legal materials can be taken to yard. During yard time, inmates have access to the gym, which includes equipment for basketball and volleyball, a cross-country ski machine, weightlifting, and an exercise bike. The gym is open at least six hours a day, seven days a week.

MPCF allows yard privileges from dawn to dusk. Equipment is available for weightlifting, softball, volleyball, basketball, tennis, pickleball, and horseshoes. A walking path and phone usage also are available. Inmates can take writing materials, personal radios, and musical instruments to yard.

CCF allows yard privileges from dawn to dusk. Equipment is available for miniature golf, horseshoes, sand volleyball, basketball, tennis, and weightlifting. Inmates can take writing materials and personal radios to the yard. Musical instruments are not allowed in the yard, but CCF inmates can use a designated music room to play guitars and the piano.

IMCC inmates have dawn to dusk yard time with equipment for weightlifting, basketball, tennis, horseshoes, softball, and volleyball. There is also a gymnasium at IMCC. IMR has yard hours from breakfast to 5:30 p.m. for lower level inmates, and until 10:00 p.m. for Level 5 inmates. Equipment is provided for weightlifting, volleyball, handball, basketball, softball, football, miniature golf, and horseshoes. IMR also has an indoor gymnasium.

The parties did not provide details about available yard hours at ISP, but Plaintiffs acknowledge they are fewer than at ICIW. The ISP yard includes a track, ball diamond, weightlifting area, tennis court, basketball court, volleyball court, and handball court. The indoor gymnasium has a basketball court, weightlifting area, stair machine, shuffleboard, table tennis, punching bags, and handball area.

### d. Library Access

Plaintiffs claim gender based disparate treatment because of different library hours available at NCCF, CCF, and MPCF.

As discussed at Section III(A)(1)(b)(3), the ICIW library is open seven days a week for a total of 57 hours; of which three hours a week are reserved for certain units. No special time is reserved solely for minimum security inmates. The extra privilege unit can use the library in the evening. Requests for extra library time are accommodated. (Burnell Dep. at 32; Trial Tr. at 781.)

Plaintiffs make the same claims regarding library hours for minimum security inmates that were made for all ICIW inmates.[43] Because Plaintiffs raise no new issues, the court reaffirms its findings made in Section III(A)(1)(b)(3).

### e. Access to Hobby Crafts

Plaintiffs claim that, although hobby craft is more important to long-term inmates than short-term minimum security inmates, minimum security inmates are burdened by inadequate hobby craft activities.[44] ICIW has a designated hobby craft area that opened in March, 1994. (Trial Tr. at 1012.) Hobby craft activities include sewing, mirror etching, wood burning, and needle crafts. (Trial Tr. at 776, 1024.) ICIW inmates have the opportunity for input on the types of hobby crafts available; they have not expressed interest in having leather crafts at ICIW. (Trial Tr. at 778.) Leather working was dropped at ICIW because of the expense and lack of interest. (Trial Tr. at 1024.) Inmates choose the hobby crafts that interest them and are allowed to buy materials for their hobbies. (Trial Tr. at 778.) The recreation director provides the craft classes and materials for which inmates have expressed an interest. (Trial Tr. at 1024.) Volunteers sometimes can provide supervision of hobby craft activities, if no tools or chemicals are involved. (Trial Tr. at 778–79.) Some craft materials can be kept in the ICIW inmate's room. (Rode Dep. at 64.)[45]

**43.** Plaintiff class also makes the same challenge to library access for medium and maximum security inmates. The findings provided for minimum security inmates and all ICIW inmates apply to the other security levels, and there is no reason to reiterate them in the sections that pertain to claims applicable to medium and maximum security inmates.

**44.** Plaintiff class makes the same challenge to hobby craft access for medium and maximum

security inmates. The findings provided for minimum security inmates and all ICIW inmates apply to the other security levels, and there is no reason to reiterate them in the sections that pertain to claims applicable to medium and maximum security inmates.

**45.** Plaintiffs make the same claim of gender disparate treatment for medium and maximum security inmates because MPCF and CCF encourage hobby crafts, and IMR and ISP have exten-

The court adopts Plaintiffs' limited summary of hobby craft activities available at ISP, NCCF, MPCF, CCF, IMCC, which have equipped hobby craft areas. The hobby craft area at IMR is equipped with power tools. (Pls.' Proposed Findings of Facts at 67, 77, 84.)

### f. Telephone Privileges

Plaintiffs claim gender based disparate treatment because NCCF and MPCF minimum security inmates are unrestricted in making collect telephone calls. At ICIW, phone privileges are part of the level system. Level A and Level B inmates are permitted one call per day; Level C inmates are permitted two calls per day; Level D inmates are permitted three calls per day, and Level E inmates have unlimited calls. (Pls.' Ex. 131.) [46]

At IMR, no personal calls (only legal or emergency calls) are permitted until an inmate reaches Level V, at which time he may purchase calling cards for 60 minutes of calls per month, with a 12 minute per call limit. There was no evidence about telephone privileges at other institutions with minimum security inmates.

### g. Limitation on Canteen Privileges

Plaintiffs claim gender based disparate treatment because men's institutions generally do not include canteen purchase limitations as part of an incentive level system.[47] At ICIW, various limitations are put on weekly purchases from the canteen.[48]

ICIW is *not* the only institution that limits canteen purchases. ISP also limits canteen purchases to $100 every two weeks. (Hedgepeth Dep. at 6–8.) Moreover, institutions allow exceptions to the canteen limits for special purchases.

### 2. Conclusions of Law

Plaintiffs single out male minimum security inmates at MPCF, CCF, and especially NCCF as most similar to minimum security inmates at ICIW. The court concludes that ICIW inmates are not, with regard to the claims raised, similarly situated to inmates in any men's institutions. Minimum security inmates reside at every institution. (Appendix C.) It is inappropriate to compare ICIW inmates, representing a wide range of security levels, with men's institutions that do not have the same broad range of security levels. Even though women and men minimum security inmates are not similarly situated, the court has examined the programs and policies for a rational relationship to legitimate state interests, and has searched for any invidious discrimination.

The court reaffirms its conclusions regarding classifications of inmates and assignment to the MLO unit, as set out in Section III(B)(2).

██ The court concludes that work opportunities for men and women inmates are similar. Work policies are gender neutral in design and application. The court finds ICIW's allocation of resources in providing on-site job opportunities are rationally related to legitimate governmental interests in security and rehabilitation. The court discerns no invidious discrimination in work opportunities.

██ The court concludes that yard privileges for women minimum security inmates are similar to those for male minimum security inmates. Yard policies are gender neutral in design and application, and are rationally related to legitimate governmental interests in security. Minor differences in use of the yard do not amount to invidious discrimi-

---

sive hobby craft activities. The findings for minimum security inmates apply to the other security levels, and there is no need to reiterate them in the sections on medium and maximum security inmates.

**46.** The findings on phone privileges apply to the section on claims applicable to medium and maximum security inmates.

**47.** Plaintiff class makes a similar challenge to the limitations put on weekly spending at the canteen for inmates classified at medium and maxi-

mum security levels. The findings provided for minimum security inmates apply to the other security levels, and there is no need to reiterate them in the sections that pertain to claims applicable to medium and maximum security inmates.

**48.** Level A inmates can make hygiene purchases only; Level B inmates are limited to $20 per week; Level C inmates are limited to $35 per week; Level D and E inmates have no limits on spending. (Pls.' Ex. 131.)

nation, nor do minor differences in the number or variety of exercise activities.

■ The court concludes that library access is equivalent for male and female inmates. Minimum security inmates at ICIW have adequate library access for educational and legal use. Library policies are gender neutral in design and application, and are rationally related to legitimate governmental interests in security and inmate access to the courts. The court discerns no invidious discrimination in the scheduling of library hours.

■ The court concludes that policies regarding hobby crafts are substantially similar in the men's and women's institutions. Policies are gender neutral in design and application, and are rationally related to legitimate governmental interests in security and rehabilitation. The court discerns no invidious discrimination in the types and availability of hobby crafts.

■ The court concludes that the telephone privileges for minimum security inmates at ICIW are substantially similar to those offered to male inmates. Policies are gender neutral in design and application. The differing limits on phone calls are factors of the level system and populations among the various institutions, and are rationally related to legitimate governmental interests in security and rehabilitation. There is no invidious discrimination in the availability of phone privileges.

■ The court concludes that canteen policies are gender neutral in design and application. Limitations on canteen purchases at ICIW as part of the level system are rationally related to legitimate governmental interests in security and rehabilitation. The court discerns no invidious discrimination in the differing limits on canteen purchases allowed at the institutions.

### D. Claims Applicable to Medium Security Inmates

#### 1. Findings of Fact

Plaintiffs allege equal protection violations regarding prison policies affecting medium security inmates. Based on the following findings of fact, the court concludes that the challenged policies are gender neutral in design and application and are rationally related to the State's legitimate interests in security for inmates, staff, visitors, and the public, and rehabilitation of inmates. The court has found no evidence of any invidious discrimination.

About half of ICIW inmates are classified as medium security. (Appendix C.) Medium security inmates predominate at several men's institutions: JBCC, IMR, MPCF, CCF, and IMCC. (Appendix C.) Plaintiffs' claims applicable to medium security inmates relate to off institutional grounds and off secured perimeter work opportunities, access to library, access to hobby craft, phone privileges, and limitations on canteen purchases. These claims are similar or identical to claims discussed above in the Sections III(A)(1)(b), (h) and (i), and III(C)(1)(b), (e) and (f). The court reaffirms those findings of fact as they relate to medium security inmates. The following findings of facts regard claims applicable to medium security inmates for obtaining better housing and greater privileges, and yard privileges.

Based on the following findings of fact, the court concludes that the challenged policies are gender neutral in design and application and are rationally related to the State's legitimate interests in security for inmates, staff, visitors, and the public, and rehabilitation of inmates. The court has found no evidence of any invidious discrimination.

#### a. Policies and Practices for Inmates Obtaining Better Housing and Greater Privileges

Plaintiffs claim gender disparate treatment because IMR and IMCC inmates can change housing and receive more privileges based on their institutional behavior, without regard to custody scores; at MPCF and CCF, housing is determined by treatment; and at JBCC, housing and privileges are uniform. ICIW's "level system" was discussed in Section III(A)(1)(n). The court reaffirms those findings of fact.

Plaintiffs correctly state that IMR and IMCC inmates can "better" their housing and privileges by exhibiting good behavior.

The court, however, disagrees with Plaintiffs' claim that gender motivates the policy, or that women inmates are burdened by having their housing tied to custody scores and privilege level classifications. ICIW inmates generally are housed together (dormitory style) with inmates in the same privilege level. The court finds that ICIW housing for medium security inmates generally is better than the housing available to virtually all men medium security inmates. In comparing ICIW to IMCC and IMR on the different policies and incentives in advancing to better housing, Plaintiffs ignore the fact that IMR inmates are housed in cells in a walled institution more than a century old, with about 1400 inmates living in a facility with a design capacity of 840. The IMCC facility is used primarily as the Iowa DOC reception and medical treatment center. It houses few inmates for more than 90 days in its general population. The court finds that medium security inmates at ICIW are housed in an institution with overall conditions clearly less onerous than experienced at other institutions for men.

### b. Yard Privileges

Plaintiffs claim gender disparate treatment because men inmates at certain institutions have different yard privileges from those at ICIW. Findings on yard privileges at ICIW, MPCF, and CCF are discussed in Section III(C)(1)(c). The court reaffirms those findings of fact. ICIW medium security inmates have the same access to the yard as inmates in other security classifications.

### 2. Conclusions of Law

The court reaffirms the conclusions of law relating to claims regarding off-site work, library access, hobby craft access, telephone privileges and canteen policies, as set forth in Sections III(A)(2), III(B)(2), and III(C)(2).

■ The court concludes that policies and practices regarding housing and privileges are substantially similar for women and men medium security inmates. The "level systems" that have been adopted at the various institutions are not identical, but they all are rationally related to a legitimate governmental interest in encouraging inmate rehabilitation through good behavior, and in ensuring

security for inmates, staff, and others. The policies are gender neutral in design and application. The fact that male medium security inmates might be placed at various institutions, while women will spend their sentences at ICIW, does not substantially burden women. The court discerns no invidious discrimination.

■ The court concludes that yard privileges for women and men medium security inmates are substantially similar. Medium security women inmates have access to the same yard as minimum security inmates. As the court found with respect to minimum security inmates, liberal yard time is available to ICIW inmates. Yard activities may not be identical to those available at all men's institutions, but ICIW inmates are provided a variety of activities. Yard policies are gender neutral in design and application. They are rationally related to a legitimate governmental interest in security. The court discerns no invidious discrimination.

Based on these findings of fact, the court concludes that the challenged policies are gender neutral in design and application, and are rationally related to legitimate governmental interests in security for inmates, staff, visitors and the public, as well as rehabilitation of inmates. The court has found no evidence of any invidious discrimination in treatment of medium security women inmates.

### E. Claims Applicable to Maximum Security Inmates

#### 1. Findings of Fact

Plaintiffs allege equal protection violations regarding maximum security inmates. Plaintiffs' claims about off institutional grounds and off secured perimeter work opportunities, access to library, access to hobby craft, phone privileges, visitation, and limitations on canteen purchases are similar to claims made in the sections on claims applicable to inmates at other security levels. The court reaffirms the findings of fact set out in Sections III(A)(1)(b), (h), (i) and (o), III(C)(1)(b), (e) and (f). The following findings of facts regard claims applicable to maximum security inmates for obtaining better

housing and greater privileges, and yard privileges.

Based on the following findings of fact, the court concludes that the challenged policies are gender neutral in design and application and rationally related to the State's interests in security for inmates, staff, visitors, and the public, as well as rehabilitation of inmates. The court has found no evidence of any invidious discrimination.

### a. Policies and Practices for Inmates Obtaining Better Housing and Greater Privileges

Plaintiffs claim gender-disparate treatment because maximum security ISP and IMR inmates can change housing and receive more privileges based on their conduct and behavior. The findings about the level system, set out in Section III(A)(1)(n), also are applicable to maximum security inmates and the court reaffirms its findings.

Plaintiffs provided an anecdotal description of an inmate in the ISP honor lifer system,[49] in a "living unit" (cellhouse) that he may paint so long as it is "consistent with good taste," who can shower at will, who has an ice machine available, and who attends an annual banquet with two guests. (Pls.' Proposed Findings of Facts at 82.) The inmates at ICIW who are serving life sentences have living units and privileges which are better than those of the honor lifer cellblock at ISP because inmates at ICIW live in dormitories, mingle with all security levels of inmates, and generally have more privileges. Plaintiffs strain credulity in fashioning an equal protection claim that attempts to show that ICIW inmates are burdened in comparison to how ISP maximum security life-sentence inmates obtain "better" housing.

### b. Yard Privileges

Plaintiffs claim gender based disparate treatment because men inmates at certain institutions, especially ISP, have different yard privileges than ICIW inmates. The court reaffirms the findings on yard privileges set out in Section III(B)(1)(d). Yard privileges are not restricted for ICIW maximum security inmates. The same policies apply to all ICIW inmates who have access to the yard within the perimeter fence.

### 2. Conclusions of Law

■ The court again concludes the level system at ICIW is substantially similar to other systems applied to maximum security men inmates. Housing and privileges for men and women inmates may vary according to the individual inmate's behavior, but the policies are substantially similar. The policies at ICIW are gender neutral in design and application, and are rationally related to legitimate governmental interests in security and rehabilitation. The court has found no invidious discrimination.

■ Yard privileges for maximum security inmates are substantially similar for women and men inmates. The court concludes that yard policies are gender neutral in design and application and are rationally related to legitimate governmental interests in security. The court discerns no invidious discrimination.

Based on these findings of fact, the court concludes that all of the challenged policies for maximum security inmates are gender neutral in design and application, and are rationally related to legitimate governmental interests in security for inmates, staff, visitors, and the public, as well as rehabilitation of inmates. The court has found no evidence of any invidious discrimination.

## IV. CONCLUSION

The court concludes, as to the equal protection issues raised by the Plaintiffs, that Iowa women and men inmates are not similarly situated as a group or in separate classes. After examining factors such as population, security level, type of crime, length of sentence, and special characteristics of inmates, the court concludes that ICIW, which houses women inmates of all security levels, cannot be compared with selected men's institutions that house segments of the male inmate population. The court has extended the inquiry to examine whether policies that are gender neutral are rationally related to legitimate governmental interests,

---

**49.** The honor lifer program is governed by the *Hazen* consent decree.

and whether there was any evidence of invidious discrimination.

The court concludes there is no equal protection violation. Programs and policies are not identical among all the Iowa correctional institutions. "Indeed, as between any two prisons, there will always be stark differences in programming." *Klinger*, 31 F.3d at 732. A careful review of Iowa prison programs leads the court to conclude that policy and program differences are motivated by legitimate concerns for security and rehabilitation. They are not gender-motivated. The court found no evidence that the State "is pursuing an improper purpose, one that furthers or contains 'fixed notions concerning the roles and abilities of males and females.'" *Pitts*, 866 F.2d at 1454 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. at 725, 102 S.Ct. at 3336–37. The record shows no archaic stereotyping being practiced by the Iowa DOC in its correctional mission, and women inmates have not been treated as second-class citizens compared to men inmates.

The court was not presented with any evidence regarding the decision to segregate or any evidence regarding budgetary comparisons because those issues were not raised by the plaintiffs. Nor did the Plaintiffs challenge the decisionmaking processes of the Iowa DOC. Rather, the challenges related solely to programming and policy implementation.

■ The court concludes that differences in programming at ICIW, compared with programming at all of Iowa's penal institutions, result generally from the fact that ICIW has different institutional needs and is administered by different people who exercise discretion to operate the facility in a manner that the administration thinks best meets those needs. After scrutinizing all of the claims, the court finds no equal protection or other constitutional violations. Programs and services offered to the ICIW population are the end product of ICIW prison

officials' day-to-day administrative decisions. The court is reluctant to substitute its judgment for that of prison administrators in reviewing day-to-day program and management decisions because it may "seriously hamper[ ] [their] ability to ... adopt innovative solutions to the intractable problems of prison administration." *Klinger*, 31 F.3d at 732 (relying on *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261–62). DOC and ICIW policies examined by the court are gender neutral and rationally related to legitimate State goals. The court defers to Warden Long's day-to-day management of ICIW because Plaintiffs have failed to show any discriminatory policymaking or application at ICIW. The court has found no evidence of invidious discrimination.

■ The court disagrees with Plaintiffs' premise that where there are differences between programs and services at ICIW and certain men's institutions, there must be a gender based equal protection violation. "[U]sing an inter-prison program comparison to analyze equal protection claims improperly assumes that the Constitution requires all prisons to have similar program priorities and to allocate resources similarly." *Klinger*, 31 F.3d at 732. Selecting programs and services from ten separate correctional programs to use as evidence in some 43-odd claims that ICIW is "inferior" in some ways to men's institutions is as facile an exercise as focusing on the numerous ways that ICIW is "better" than certain men's institutions. The Fourteenth Amendment guarantees equal laws, not equal results. *Feeney*, 442 U.S. at 273, 99 S.Ct. at 2293.

On remand, the court again finds Plaintiffs have not established their equal protection claims, and that there is no invidious gender discrimination at ICIW. The claims against all Defendants should be dismissed.

This opinion is hereby certified to the United States Court of Appeals for the Eighth Circuit in accordance with their instructions.

# APPENDIX A

Iowa DOC Statistical Summary (February 1994)

| Overall Prison Population | | | | ICIW | | | | ICIW—Violator | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total inmates | = | 5031 | | Total inmates | = | 238 | | Total inmates | = | | 18 |
| (4731 men + 300 women) | | | | | | | | | | | |
| Median age | = | 30 | | Median age | = | 31 | | Median age | = | | 29 |
| Average age | = | 31 | | Average age | = | 32 | | Average age | = | | 29 |

| Age: Distribution | | | Frequency | Age: Distribution | | | Frequency | Age: Distribution | | | Frequency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9–17 | = | 17 | .3% | 9–17 | = | 0 | 0% | 9–17 | = | 0 | 0% |
| 18–20 | = | 440 | 8.7% | 18–20 | = | 5 | 2.1% | 18–20 | = | 0 | 0% |
| 21–25 | = | 1200 | 23.8% | 21–25 | = | 48 | 20.1% | 21–25 | = | 7 | 38.8% |
| 26–30 | = | 1037 | 20.6% | 26–30 | = | 62 | 26.0% | 26–30 | = | 3 | 16.6% |
| 31–35 | = | 943 | 18.7% | 31–35 | = | 49 | 20.5% | 31–35 | = | 7 | 38.8% |
| 36–40 | = | 612 | 12.1% | 36–40 | = | 39 | 16.3% | 36–40 | = | 1 | 5.5% |
| 41–50 | = | 565 | 11.2% | 41–50 | = | 27 | 11.3% | 41–50 | = | 0 | 0% |
| 51–60 | = | 159 | 3.1% | 51–60 | = | 6 | 2.5% | 51–60 | = | 0 | 0% |
| 61–70 | = | 47 | .9% | 61–70 | = | 2 | .8% | 61–70 | = | 0 | 0% |
| 71–80 | = | 11 | .2% | 71–80 | = | 0 | 0% | 71–80 | = | 0 | 0% |
| 81 + | = | 0 | 0% | 81 + | = | 0 | 0% | 81 + | = | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Education Level | | | | Education Level | | | | Education Level | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average | = | | 11.4 | Average | = | | 11.6 | Average | = | | 11.9 |
| 1–5 | = | 37 | .7% | 1–5 | = | 1 | .4% | 1–5 | = | 0 | 0% |
| 6–8 | = | 313 | 6.2% | 6–8 | = | 10 | 4.2% | 6–8 | = | 0 | 0% |
| 9–11 | = | 1003 | 19.9% | 9–11 | = | 45 | 19.9% | 9–11 | = | 5 | 27.7% |
| 12 | = | 1084 | 21.5% | 12 | = | 58 | 24.3% | 12 | = | 6 | 33.3% |
| GED | = | 2008 | 39.9% | GED | = | 91 | 38.2% | GED | = | 3 | 16.6% |
| 13–16 | = | 437 | 8.6% | 13–16 | = | 29 | 12.1% | 13–16 | = | 4 | 22.2% |
| 17 + | = | 24 | .4% | 17 + | = | 0 | 0% | 17 + | = | 0 | 0% |
| Tec/Voc | | 3 | .05% | Tec/Voc | | 1 | .4% | Tec/Voc | | 0 | 0% |
| Sp.Ed. | | 62 | 1.2% | Sp.Ed. | | 1 | .4% | Sp.Ed. | | 0 | 0% |
| Unknown | | 60 | 1.1% | Unknown | | 2 | .8% | Unknown | | 0 | 0% |

| Sentences (years) | | | | Sentences (years) | | | | Sentences (years) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| <2 | = | 30 | .5% | <2 | = | 3 | 1.2% | <2 | = | 0 | 0% |
| 2–5 | = | 276 | 5.4% | 2–5 | = | 29 | 12.1% | 2–5 | = | 0 | 0% |
| 5–10 | = | 1264 | 25.1% | 5–10 | = | 62 | 26.0% | 5–10 | = | 0 | 0% |
| 10–15 | = | 1990 | 39.5% | 10–15 | = | 89 | 37.3% | 10–15 | = | 1 | 5.5% |
| 15–20 | = | 174 | 3.4% | 15–20 | = | 7 | 2.9% | 15–20 | = | 0 | 0% |
| 20–25 | = | 18 | .3% | 20–25 | = | 1 | .4% | 20–25 | = | 0 | 0% |
| 25–50 | = | 678 | 13.4% | 25–50 | = | 17 | 7.1% | 25–50 | = | 1 | 5.5% |
| 50 + | = | 487 | 9.6% | 50 + | = | 30 | 12.6% | 50 + | = | 0 | 0% |
| Unknown | | 114 | 2.2% | Unknown | | 0 | 0% | Unknown | | 16 | 88.8% |

Source: Defendants' Exhibit B.

Iowa DOC Statistical Summary (February 1994)

| ISF | | | | JBCC | | | | Farm #1 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total inmates | | = | 559 | Total inmates | = | | 137 | Total inmates | = | | 77 |
| Median age | | = | 32 | Median age | = | | 31 | Median age | = | | 33 |
| Average age | | = | 34 | Average age | = | | 32 | Average age | = | | 35 |

| Age: Distribution | | | Frequency | Age: Distribution | | | Frequency | Age: Distribution | | | Frequency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9–17 | = | 0 | 0% | 9–17 | = | 0 | 0% | 9–17 | = | 0 | 0% |
| 18–20 | = | 20 | 3.5% | 18–20 | = | 5 | 3.6% | 18–20 | = | 0 | 0% |
| 21–25 | = | 103 | 18.4% | 21–25 | = | 24 | 17.5% | 21–25 | = | 12 | 15.5% |
| 26–30 | = | 121 | 21.6% | 26–30 | = | 34 | 24.8% | 26–30 | = | 16 | 20.7% |
| 31–35 | = | 109 | 19.4% | 31–35 | = | 40 | 29.0% | 31–35 | = | 17 | 22.0% |
| 36–40 | = | 74 | 13.3% | 36–40 | = | 13 | 9.4% | 36–40 | = | 12 | 15.5% |
| 41–50 | = | 97 | 17.3% | 41–50 | = | 14 | 10.2% | 41–50 | = | 15 | 19.4% |
| 51–60 | = | 29 | 5.0% | 51–60 | = | 6 | 4.3% | 51–60 | = | 5 | 6.4% |
| 61–70 | = | 3 | .5% | 61–70 | = | 1 | .7% | 61–70 | = | 0 | 0% |
| 71–80 | = | 3 | .5% | 71–80 | = | 0 | 0% | 71–80 | = | 0 | 0% |
| 81 + | = | 0 | 0% | 81 + | = | 0 | 0% | 81 + | = | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Educational Level | | | | Education Level | | | | Education Level | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average | = | | 11.1 | Average | = | | 11.5 | Average | = | | 11.6 |
| 1–5 | = | 8 | 1.4% | 1–5 | = | 2 | 1.4% | 1–5 | = | 0 | 0% |
| 76–8 | = | 45 | 8.0% | 6–8 | = | 6 | 4.3% | 6–8 | = | 7 | 9.0% |
| 9–11 | = | 133 | 23.7 | 9–11 | = | 24 | 17.5% | 9–11 | = | 16 | 20.7% |
| 12 | = | 105 | 18.7% | 12 | = | 26 | 18.9% | 12 | = | 10 | 12.9% |
| GED | = | 222 | 39.0% | GED | = | 67 | 48.9% | GED | = | 32 | 41.5% |
| 13–16 | = | 35 | 4.4% | 13–16 | = | 12 | 8.7% | 13–16 | = | 11 | 14.2% |
| 17 + | = | 4 | .7% | 17 + | = | 0 | 0% | 17 + | = | 1 | 1.2% |
| Tec/Voc | | 1 | .2% | Tec/Voc | | 0 | 0% | Tec/Voc | | 0% | 0% |
| Sp.Ed. | | 2 | .3% | Sp.Ed. | | 0 | 0% | Sp.Ed. | | 0 | 0% |
| Unknown | | 4 | .7% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Sentences (years) | | | | Sentences (years) | | | | Sentences (years) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| <2 | = | 1 | 1.8% | <2 | = | 0 | 0% | <2 | = | 7 | .5% |
| 2–5 | = | 3 | 5.6% | 2–5 | = | 1 | 9% | 2–5 | = | 40 | 2.9% |
| 5–10 | = | 25 | 47.0% | 5–10 | = | 0 | 0% | 5–10 | = | 247 | 18.2% |
| 10–10 | = | 17 | 32.0% | 10–15 | = | 2 | 18% | 10–15 | = | 577 | 42.5% |
| 15–20 | = | 2 | 3.7% | 15–20 | = | 0 | 0% | 15–20 | = | 69 | 5.0% |
| 20–25 | = | 0 | 0% | 20–25 | = | 0 | 0% | 20–25 | = | 5 | .3% |
| 25–50 | = | 4 | 7.5% | 25–50 | = | 1 | 9% | 25–50 | = | 264 | 19.4% |
| 50 + | = | 1 | 1.8% | 50 + | = | 7 | 63% | 50 + | = | 146 | 10.7% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 1 | .07% |

Source: Defendants' Exhibit B.

■■■■■■

■■■■■

Iowa DOC Statistical Summary (February 1994)

| Farm 3 | | | | Multiple Care Unit – ISP | | | | IMR | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total inmates | = | 53 | | Total inmates | = | 11 | | Total inmates | = | 1356 | |
| Median age | = | 38 | | Median age | = | 51 | | Median age | = | 28 | |
| Average age | = | 37 | | Average age | = | 53 | | Average age | = | 30 | |

| Age: Distribution | | | Frequency | Age: Distribution | | | Frequency | Age: Distribution | | | Frequency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9–17 | = | 0 | 0% | 9–17 | = | 0 | 0% | 9–17 | = | 8 | .5% |
| 18–20 | = | 0 | 0% | 18–20 | = | 0 | 0% | 18–20 | = | 153 | 11.2% |
| 21–25 | = | 8 | 15.0% | 21–25 | = | 0 | 0% | 21–25 | = | 399 | 29.4% |
| 26–30 | = | 7 | 13.2% | 26–30 | = | 0 | 0% | 26–30 | = | 258 | 19.0% |
| 31–35 | = | 5 | 9.4% | 31–35 | = | 0 | 0% | 31–35 | = | 237 | 17.4% |
| 36–40 | = | 17 | 32.0% | 36–40 | = | 1 | 9.0% | 36–40 | = | 138 | 10.0% |
| 41–50 | = | 12 | 22.6% | 41–50 | = | 4 | 36.3% | 41–50 | = | 119 | 8.7% |
| 51–60 | = | 4 | 7.5% | 51–60 | = | 3 | 27.2% | 51–60 | = | 30 | 2.2% |
| 61–70 | = | 0 | 0% | 61–70 | = | 3 | 27.2% | 61–70 | = | 12 | .8% |
| 71–80 | = | 0 | 0% | 71–80 | = | 0 | 0% | 71–80 | = | 2 | .1% |
| 81 + | = | 0 | 0% | 81 + | = | 0 | 0% | 81 + | = | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Education Level | | | | Education Level | | | | Education Level | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average | = | | 11.4 | Average | = | | 10.3 | Average | = | | 11.3 |
| 1–5 | = | 0 | 0% | 1–5 | = | 1 | 9.0% | 1–5 | = | 9 | .6% |
| 6–8 | = | 4 | 7.5% | 6–8 | = | 2 | 18.0% | 6–8 | = | 113 | 8.3% |
| 9–11 | = | 11 | 20.7% | 9–11 | = | 0 | 0% | 9–11 | = | 286 | 21.0% |
| 12 | = | 9 | 16.9% | 12 | = | 3 | 27.2% | 12 | = | 244 | 17.9% |
| GED | = | 26 | 49.0% | GED | = | 4 | 36.3% | GED | = | 572 | 42.1% |
| 13–16 | = | 3 | 5.6% | 13–16 | = | 1 | 9.0% | 13–16 | = | 98 | 7.2% |
| 17 + | = | 0 | 0% | 17 + | = | 0 | 0% | 17 + | = | 5 | .3% |
| Tec/Voc | | 0 | 0% | Tec/Voc | | 0 | 0% | Tec/Voc | = | 0 | 0% |
| Sp.Ed. | | 0 | 0% | Sp.Ed. | | 0 | 0% | Sp.Ed. | = | 24 | 1.7% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 5 | .3% |

| Sentences (years) | | | | Sentences (years) | | | | Sentences (Years) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| <2 | = | 1 | .1% | <2 | = | 5 | .6% | <2 | = | 0 | 0% |
| 2–5 | = | 4 | 5.0% | 2–5 | = | 79 | 10.3% | 2–5 | = | 2 | 4.3% |
| 5–10 | = | 23 | 29.8% | 5–10 | = | 224 | 29.2% | 5–10 | = | 6 | 13.0% |
| 10–15 | = | 39 | 50.6% | 10–15 | = | 290 | 37.9% | 10–15 | = | 22 | 47.8% |
| 15–20 | = | 7 | 9.0% | 15–20 | = | 14 | 1.8% | 15–20 | = | 1 | 2.1% |
| 20–25 | = | 0 | 0% | 20–25 | = | 3 | .3% | 20–25 | = | 0 | 0% |
| 25–50 | = | 3 | 3.8% | 25–50 | = | 106 | 13.8% | 25–50 | = | 3 | 6.5% |
| 50 + | = | 0 | 0% | 50 + | = | 19 | 2.4% | 50 + | = | 1 | 2.1% |
| Unknown | | 0 | 0% | Unknown | | 25 | 3.2% | Unknown | | 11 | 23.9% |

Source: Defendants' Exhibit B.

Iowa DOC Statistical Summary (February 1994)

| LHWC | | | IMCC | | | IMCC—patients | | |
|---|---|---|---|---|---|---|---|---|
| Total inmates | = | 77 | Total inmates | = | 765 | Total inmates | = | 46 |
| | | | (725 men + 40 women) | | | (42 men + 4 women) | | |
| Median age | = | 29 | Median age | = | 30 | Median age | = | 29 |
| Average age | = | 31 | Average age | = | 31 | Average age | = | 31 |

### Age Distribution / Frequency

| Age: Distribution | | | Frequency | Age: Distribution | | | Frequency | Age: Distribution | | | Frequency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9–17 | = | 0 | 0% | 9–17 | = | 8 | 1% | 9–17 | = | 0 | 0% |
| 18–20 | = | 2 | .2% | 18–20 | = | 83 | 10.8% | 18–20 | = | 6 | 13.0% |
| 21–25 | = | 19 | 24.6% | 21–25 | = | 156 | 20.3% | 21–25 | = | 11 | 23.9% |
| 26–30 | = | 22 | 28.5% | 26–30 | = | 147 | 19.2% | 26–30 | = | 11 | 23.9% |
| 31–35 | = | 18 | 23.3% | 31–35 | = | 144 | 18.8% | 31–35 | = | 7 | 15.2% |
| 36–40 | = | 7 | 9.0% | 36–40 | = | 109 | 14.2% | 36–40 | = | 2 | 4.3% |
| 41–50 | = | 7 | 9.0% | 41–50 | = | 83 | 10.8% | 41–50 | = | 7 | 15.2% |
| 51–60 | = | 0 | 0% | 51–60 | = | 26 | 3.3% | 51–60 | = | 2 | 4.3% |
| 61–70 | = | 2 | .2% | 61–70 | = | 9 | 1% | 61–70 | = | 0 | 0% |
| 71–80 | = | 0 | 0% | 71–80 | = | 0 | 0% | 71–80 | = | 0 | 0% |
| 81 + | = | 0 | 0% | 81 + | = | 0 | 0% | 81 + | = | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

### Education Level

| Education Level | | | | Education Level | | | | Educational Level | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average | = | | 11.6 | Average | = | | 11.4 | Average | = | | 11.4 |
| 1–5 | = | 0 | 0% | 1–5 | = | 5 | .6% | 1–5 | = | 1 | 2.1% |
| 6–8 | = | 2 | .2% | 6–8 | = | 50 | 6.5% | 6–8 | = | 3 | 6.5% |
| 9–11 | = | 14 | 18.0% | 9–11 | = | 182 | 23.7% | 9–11 | = | 7 | 15.2% |
| 12 | = | 14 | 18.0% | 12 | = | 188 | 24.5% | 12 | = | 143 | .4% |
| GED | = | 39 | 50.6% | GED | = | 208 | 27.1% | GED | = | 13 | 28.2% |
| 13–16 | = | 7 | 9.0% | 13–16 | = | 78 | 10.0% | 13–16 | = | 4 | 8.6% |
| 17 + | = | 0 | 0% | 17 + | = | 7 | .9% | 17 + | = | 0 | 0% |
| Tec/Voc | | 0 | 0% | Tec/Voc | | 1 | .1% | Tec/Voc | | 0 | 0% |
| Sp.Ed. | | 1 | .1% | Sp.Ed. | | 8 | 1% | Sp.Ed. | | 3 | 6.5% |
| Unknown | | 0 | 0% | Unknown | | 38 | 4.9% | Unknown | | 1 | 2.1% |

### Sentences (years)

| Sentences (years) | | | | Sentences (years) | | | | Sentences (years) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| <2 | = | 2 | .3% | <2 | = | 0 | 0% | <2 | = | 0 | 0% |
| 2–5 | = | 9 | 1.6% | 2–5 | = | 3 | 2.1% | 2–5 | = | 7 | 9.0% |
| 5–10 | = | 45 | 8.0% | 5–10 | = | 24 | 17.5% | 5–10 | = | 43 | 55.8% |
| 10–15 | = | 147 | 26.0% | 10–15 | = | 60 | 43.7% | 10–15 | = | 18 | 23.0% |
| 15–20 | = | 20 | 3.5% | 15–20 | = | 13 | 9.4% | 15–20 | = | 4 | 5.0% |
| 20–25 | = | 2 | .3% | 20–25 | = | 1 | .7% | 20–25 | = | 0 | 0% |
| 25–50 | = | 106 | 19.0% | 25–50 | = | 21 | 15.3% | 20–50 | = | 3 | 3.8% |
| 50 + | = | 228 | 40.7% | 50 + | = | 15 | 10.9% | 50 + | = | 2 | 2.5% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

Source: Defendants' Exhibit B.

Iowa DOC Statistical Summary (February 1994)

| MPCF | | | | CCF | | | | NCCF | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total inmates | = | 815 | | Total inmates | = | 263 | | Total inmates | = | 341 | |
| Median age | = | 29 | | Median age | = | 29 | | Median age | = | 30 | |
| Average age | = | 31 | | Average age | = | 30 | | Average age | = | 32 | |

| Age: Distribution | | | Frequency | Age: Distribution | | | Frequency | Age: Distribution | | | Frequency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9–17 | = | 0 | 0% | 9–17 | = | 0 | 0% | 9–17 | = | 0 | 0% |
| 18–20 | = | 88 | 10.7% | 18–20 | = | 19 | 7.2% | 18–20 | = | 28 | 8.2% |
| 21–25 | = | 219 | 26.8% | 21–25 | = | 73 | 27.7% | 21–25 | = | 76 | 22.2% |
| 26–30 | = | 157 | 19.2% | 26–30 | = | 56 | 21.2% | 26–30 | = | 73 | 21.4% |
| 31–35 | = | 127 | 15.5% | 31–35 | = | 56 | 21.2% | 31–35 | = | 67 | 19.6% |
| 36–40 | = | 96 | 11.7% | 36–40 | = | 26 | 9.8% | 36–40 | = | 45 | 17.1% |
| 41–50 | = | 90 | 11.0% | 41–50 | = | 29 | 11.0% | 41–50 | = | 34 | 9.9% |
| 51–60 | = | 25 | 3.0% | 51–60 | = | 3 | 1.1% | 51–60 | = | 13 | 3.8% |
| 61–70 | = | 8 | .98% | 61–70 | = | 1 | .3% | 61–70 | = | 4 | 1.1% |
| 71–80 | = | 5 | .6% | 71–80 | = | 0 | 0% | 71–80 | = | 1 | .2% |
| 81 + | = | 0 | 0% | 81 + | = | 0 | 0% | 81 + | = | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Education Level | | | | Education Level | | | | Education Level | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average | = | | 11.6 | Average | = | | 11.3 | Average | = | | 11.6 |
| 1–5 | = | 3 | .3% | 1–5 | = | 3 | 1.1% | 1–5 | = | 4 | 1.1% |
| 6–8 | = | 31 | 3.8% | 6–8 | = | 20 | 7.6% | 6–8 | = | 10 | 2.9% |
| 9–11 | = | 119 | 14.6% | 9–11 | = | 56 | 21.2% | 9–11 | = | 52 | 15.2% |
| 12 | = | 203 | 24.9% | 12 | = | 49 | 18.6% | 12 | = | 79 | 23.1% |
| GED | = | 362 | 44.4% | GED | = | 109 | 41.4% | GED | = | 154 | 45.0% |
| 13–16 | = | 72 | 8.8% | 13–16 | = | 21 | 7.9% | 13–16 | = | 33 | 9.6% |
| 17 + | = | 5 | .6% | 17 + | = | 0 | 0% | 17 + | = | 2 | .5% |
| Tec/Voc | | 0 | 0% | Tec/Voc | | 0 | 0% | Tec/Voc | | 0 | 0% |
| Sp.Ed. | | 13 | 1.5% | Sp.Ed. | | 5 | 1.9% | Sp.Ed. | | 4 | 9.7% |
| Unknown | | 7 | .8% | Unknown | | 0 | 0% | Unknown | | 3 | .8% |

| Sentences (years) | | | | Sentences (years) | | | | Sentences (years) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| <2 | = | 6 | .7% | <2 | = | 1 | .3% | <2 | = | 2 | .5% |
| 2–5 | = | 49 | 6.0% | 2–5 | = | 9 | 3.4% | 2–5 | = | 30 | 8.7% |
| 5–10 | = | 277 | 33.9% | 5–10 | = | 83 | 31.5% | 5–10 | = | 131 | 38.4% |
| 10–15 | = | 380 | 46.6% | 10–15 | = | 119 | 45.2% | 10–15 | = | 131 | 38.4% |
| 15–20 | = | 10 | 1.2% | 15–20 | = | 6 | 2.2% | 15–20 | = | 12 | 3.5% |
| 20–25 | = | 3 | .3% | 20–25 | = | 1 | .3% | 20–25 | = | 1 | .2% |
| 25–50 | = | 74 | 9.0% | 25–50 | = | 30 | 11.4% | 25–50 | = | 20 | 5.8% |
| 50 + | = | 13 | 1.5% | 50 + | = | 12 | 4.5% | 50 + | = | 9 | 2.6% |
| Unknown | | 3 | .3% | Unknown | | 2 | .7% | Unknown | | 5 | 1.4% |

Source: Defendants' Exhibit B.

Iowa DOC Statistical Summary (February 1994)

| CRC | | | | CRC — Violator | | | |
|---|---|---|---|---|---|---|---|
| Total inmates | = | 183 | | Total inmates | = | 92 | |
| Median age | = | 31 | | Median age | = | 24 | |
| Average age | = | 33 | | Average age | = | 27 | |

| Age: Distribution | | | Frequency | Age: Distribution | | | Frequency |
|---|---|---|---|---|---|---|---|
| 9–17 | = | 0 | 0% | 9–17 | = | 1 | 1.0% |
| 18–20 | = | 9 | 49.1% | 18–20 | = | 22 | 23.9% |
| 21–25 | = | 17 | 9.2% | 21–25 | = | 28 | 30.4% |
| 26–30 | = | 56 | 30.6% | 26–30 | = | 14 | 15.2% |
| 31–35 | = | 43 | 23.4% | 31–35 | = | 17 | 9.2% |
| 36–40 | = | 29 | 15.8% | 36–40 | = | 3 | 3.2% |
| 41–50 | = | 21 | 11.4% | 41–50 | = | 6 | 6.5% |
| 51–60 | = | 6 | 3.2% | 51–60 | = | 1 | 1.0% |
| 61–70 | = | 2 | 1.0% | 61–70 | = | 0 | 0% |
| 71–80 | = | 0 | 0% | 71–80 | = | 0 | 0% |
| 81 + | = | 0 | 0% | 81 + | = | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Education Level | | | | Education Level | | | |
|---|---|---|---|---|---|---|---|
| Average | = | | 11.7 | Average | = | | 11.5 |
| 1–5 | = | 0 | 0% | 1–5 | = | 0 | 0% |
| 6–8 | = | 8 | 4.3% | 6–8 | = | 2 | 2.1% |
| 9–11 | = | 28 | 15.3% | 9–11 | = | 25 | 27.1% |
| 12 | = | 57 | 31.1% | 12 | = | 19 | 20.6% |
| GED | = | 64 | 34.9% | GED | = | 42 | 45.6% |
| 13–16 | = | 25 | 13.6% | 13–16 | = | 4 | 4.3% |
| 17 + | = | 0 | 0% | 17 + | = | 0 | 0% |
| Tec/Voc | | 0 | 0% | Tec/Voc | | 0 | 0% |
| Sp.Ed. | | 1 | .5% | Sp.Ed. | | 0 | 0% |
| Unknown | | 0 | 0% | Unknown | | 0 | 0% |

| Sentences (years) | | | | Sentences (years) | | | |
|---|---|---|---|---|---|---|---|
| <2 | = | 2 | 1.0% | <2 | = | 0 | 0% |
| 2–5 | = | 11 | 6.0% | 2–5 | = | 0 | 0% |
| 5–10 | = | 58 | 31.6% | 5–10 | = | 16 | 17.3% |
| 10–15 | = | 74 | 40.4% | 10–15 | = | 24 | 26.0% |
| 15–20 | = | 8 | 4.3% | 15–20 | = | 1 | 1.0% |
| 20–25 | = | 1 | .5% | 20–25 | = | 0 | 0% |
| 25–50 | = | 24 | 13.1% | 25–50 | = | 1 | 1% |
| 50 + | = | 4 | 2.1% | 50 + | = | 0 | 0% |
| Unknown | | 1 | .5% | Unknown | | 50 | 54.3% |

Source: Defendants' Exhibit B.

## APPENDIX B

### Time Served Before Parole
### (July 1992—June 1993)

| | Women | | Men | |
|---|---|---|---|---|
| | Avg. Months | Count | Avg. Months | Count |
| Serious Misdemeanor | 8.6 | 2 | 6.9 | 10 |
| Aggravated Misdemeanor | 8.7 | 52 | 8.5 | 285 |
| Felony | 147.6 | 2 | 218.4 | 5 |
| D Felony | 13.9 | 94 | 16.9 | 911 |
| C Felony | 26.2 | 51 | 39.7 | 791 |
| B Felony | — | 0 | 92.2 | 66 |
| Habitual Offender | 95.9 | 2 | 73.4 | 29 |
| Other Felony | — | — | 30.6 | 1 |
| TOTAL | 17.7 | 203 | 28 | 2098 |

Source: Defendants' Exhibit A.

## APPENDIX C

Summary of Institutional Security Levels and Inmate Security Levels

| INSTITUTION | PRIMARY SECURITY LEVEL | AUTHORIZED SECURITY LEVEL | DESIGN CAPACITY | 4/2/93 TOTAL POP., | 4/2/93 LIFERS | 4/2/93 POPULATION SECURITY CLASSIFICATION PERCENT | | STAFF | FY '94 BUDGET (7/93–6/94) |
|---|---|---|---|---|---|---|---|---|---|
| ISP | Maximum | Maximum | 570 | 596 | 230 | Minimum: | 61 1.0 | 490 | $24,593,689 |
| | | | | | | Medium: | 64 12.0 | | |
| | | | | | | Maximum: | 471 87.0 | | |
| JBCC | Medium | Medium Maximum | 100 | 139 | 11 | Minimum: | 12 9.0 | Incl. in ISP | |
| | | | | | | Medium: | 126 91.0 | | |
| | | | | | | Maximum: | 1 0.7 | | |
| Farms | Minimum Live-out | MLO | 150 | 143 | 0 | Minimum: | 12 99.3 | Incl. in ISP | |
| | | | | | | Medium: | 1 .7 | | |
| IMR | Medium | Medium Minimum | 840 | 1233 | 91 | Minimum | 66 5.0 | 351 | $18,130,950 |
| | | | | | | Medium: | 1154 89.0 | | |
| | | | | | | Maximum: | 73 6.0 | | |
| LHWC | Minimum Live-out | MLO | 71 | 72 | 0 | Minimum: | 71 9.0 | Incl. in ISP | |
| | | | | | | Medium: | 1 1.0 | | |
| MPCF | Medium | Medium Minimum | 528 | 807 | 11 | Minimum: | 71 9.0 | 259 | $13,141,782 |
| | | | | | | Medium: | 736 91.0 | | |
| CCF | Medium | Medium Minimum | 155 | 273 | 9 | Minimum: | 71 26.0 | 136 | $ 6,279,833 |
| | | | | | | Medium: | 202 74.0 | | |
| NCCF | Minimum | Minimum | 228 | 236 | 3 | Minimum: | 235 99.6 | 112 | $ 5,302,937 |
| | | | | | | Maximum: | 1 .4 | | |
| CRC | Minimum Live-out | MLO | 121 | 148 | 0 | Minimum: | 146 99.0 | 110 | $ 5,222,453 |
| | | | | | | Maximum: | 2 1.0 | | |
| IMCC | Medium | Medium Minimum Maximum | 575 | 579 | 8 | Minimum: | 148 26.0 | 320 | $15,363,839 |
| | | | | | | Medium: | 284 49.0 | | |
| | | | | | | Maximum: | 10 2.0 | | |
| | | | | | | None: | 137 23.0 | | |
| ICIW | Medium | Minimum Medium Maximum MLO | 230 | 219 | 17 | Minimum: | 102 47.0 | 133 | $ 6,107,163 |
| | | | | | | Medium: | 117 53.0 | | |

Sources: Plaintiffs' Exhibit 115.
Iowa DOC, <u>Annual Report</u> (1993).

# APPENDIX D
Types of Crimes
(February 1994)

**ISP**
- Life sentences — 208
- Person crimes — 404
- Non-person crimes — 198
- Chemical crimes — 30

**JBCC**
- Life sentences — 11
- Person crimes — 72
- Non-person crimes — 70
- Chemical crimes — 28

**Farm 1**
- Life sentences — 0
- Person crimes — 19
- Non-person crimes — 45
- Chemical crimes — 20

**Farm 3**
- Life sentences — 0
- Person crimes — 9
- Non-person crimes — 27
- Chemical crimes — 21

**ISP Multiple Care**
- Life sentences — 7
- Person crimes — 9
- Non-person crimes — 0
- Chemical crimes — 2

**IMR**
- Life sentences — 91
- Person crimes — 719
- Non-person crimes — 670
- Chemical crimes — 209

**LHWC**
- Life sentences — 0
- Person crimes — 11
- Non-person crimes — 54
- Chemical crimes — 23

**IMCC**
- Life sentences — 8
- Person crimes — 314
- Non-person crimes — 328
- Chemical crimes — 233

**IMCC Patients**
- Life sentences — 0
- Person crimes — 22
- Non-person crimes — 19
- Chemical crimes — 3

**MPCF**
- Life sentences — 11
- Person crimes — 430
- Non-person crimes — 376
- Chemical crimes — 150

**CCF**
- Life sentences — 9
- Person crimes — 91
- Non-person crimes — 145
- Chemical crimes — 69

**NCCF**
- Life sentences — 3
- Person crimes — 85
- Non-person crimes — 215
- Chemical crimes — 93

**CRC**
- Life sentences — 0
- Person crimes — 54
- Non-person crimes — 102
- Chemical crimes — 60

**CRC Violator**
- Life sentences — 0
- Person crimes — 6
- Non-person crimes — 32
- Chemical crimes — 6

**ICIW**
- Life sentences — 17
- Person crimes — 76
- Non-person crimes — 127
- Chemical crimes — 65

**ICIW Violator**
- Life sentences — 0
- Person crimes — 1
- Non-person crimes — 1
- Chemical crimes — 1

Source: Defendants' Exhibit B.

# APPENDIX E
Number of Sentences Per Inmate
(Consecutive and Concurred)

(February 1994)

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9+ |
|---|---|---|---|---|---|---|---|---|---|---|
| ISP | 0 | 289 | 146 | 54 | 36 | 14 | 9 | 3 | 1 | 7 |
| [Multiple Care Unit] | [0] | [9] | [2] | [0] | [0] | [0] | [0] | [0] | [0] | [0] |
| JBCC | 0 | 64 | 38 | 23 | 7 | 3 | 1 | 0 | 0 | 1 |
| Farm 1 | 0 | 50 | 16 | 6 | 3 | 2 | 0 | 0 | 0 | 0 |
| Farm 3 | 0 | 31 | 17 | 2 | 2 | 1 | 0 | 0 | 0 | 0 |
| IMR | 0 | 624 | 404 | 175 | 82 | 40 | 13 | 6 | 6 | 6 |
| LHWC | 0 | 28 | 27 | 11 | 6 | 3 | 1 | 1 | 0 | 0 |
| IMCC | 16 | 374 | 217 | 93 | 27 | 22 | 12 | 3 | 0 | 1 |
| [Patients] | [11] | [17] | [12] | [3] | [3] | [0] | [0] | [0] | [0] | [0] |
| MPCF | 2 | 452 | 197 | 92 | 37 | 19 | 8 | 3 | 1 | 4 |
| CCF | 0 | 147 | 72 | 25 | 9 | 4 | 3 | 2 | 0 | 1 |
| NCCF | 0 | 167 | 99 | 43 | 11 | 8 | 9 | 0 | 2 | 2 |
| CRC | 0 | 86 | 57 | 17 | 17 | 4 | 1 | 0 | 0 | 1 |
| [Violator] | [50] | [25] | [13] | [3] | [1] | [0] | [0] | [0] | [0] | [0] |
| ICIW | 0 | 117 | 72 | 30 | 11 | 3 | 0 | 1 | 2 | 2 |
| [Violator] | [16] | [0] | [1] | [1] | [0] | [0] | [0] | [0] | [0] | [0] |

Source: Defendants' Exhibit B.

# APPENDIX F
Custody Score Breakdown

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ISP | 0 | 0 | 2 | 3 | 3 | 11 | 29 | 27 | 51 | 60 | 54 | 95 | 65 | 44 | 35 | 24 | 17 | 8 | 31 |
| [Mult. Care] | [0] | [0] | [1] | [0] | [0] | [0] | [1] | [1] | [1] | [1] | [0] | [3] | [1] | [1] | [1] | [0] | [0] | [0] | [0] |
| JBCC | 0 | 1 | 2 | 5 | 2 | 10 | 28 | 32 | 23 | 20 | 11 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Farm 1 | 0 | 3 | 13 | 17 | 15 | 14 | 3 | 7 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Farm 3 | 2 | 1 | 4 | 11 | 11 | 17 | 6 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IMR | 0 | 6 | 7 | 17 | 42 | 70 | 154 | 159 | 222 | 196 | 154 | 128 | 99 | 34 | 25 | 18 | 13 | 5 | 7 |
| LHWC | 2 | 4 | 7 | 6 | 18 | 16 | 12 | 7 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IMCC | 1 | 3 | 40 | 59 | 81 | 78 | 112 | 105 | 79 | 50 | 26 | 20 | 17 | 8 | 2 | 2 | 0 | 0 | 0 |
| [patients] | [0] | [0] | [1] | [3] | [6] | [1] | [5] | [4] | [4] | [1] | [4] | [3] | [2] | [2] | [1] | [0] | [0] | [0] | [0] |
| MPCC | 0 | 2 | 14 | 61 | 83 | 108 | 175 | 149 | 93 | 63 | 37 | 16 | 7 | 4 | 2 | 1 | 0 | 0 | 0 |
| NCCF | 0 | 11 | 24 | 62 | 79 | 98 | 31 | 15 | 12 | 7 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| CRC | 0 | 6 | 19 | 35 | 44 | 44 | 15 | 10 | 5 | 4 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| ICIW | 0 | 2 | 23 | 39 | 18 | 19 | 28 | 27 | 27 | 9 | 19 | 12 | 5 | 5 | 0 | 1 | 3 | 1 | 0 |

Source: Defendants' Exhibit B